(161 P.3d 765)
No. 95,796

FLEETWOOD ENTERPRISES, INC., *Appellee*, v. THE COLEMAN COMPANY, INC., *Appellant*.

Opinion
filed May 25, 2007.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, and *Mikel L. Stout* and *Todd N. Tedesco*, of Wichita, for appellant.

*Jeffrey T. Thomas*, of Gibson, Dunn & Crutcher LLP, of Irvine, California, *Stephen R. McAllister* and *Todd N. Thompson*, of Thompson Ramsdell & Qualseth, P.A., of Lawrence, and *Eldon L. Boisseau*, of Law Offices of Eldon L. Boisseau, of Wichita, for appellee.

Before HILL, P.J., MARQUARDT, J., and KNUDSON, S.J.

HILL, J.: This case arises from a summary judgment ruling that permanently enjoined Coleman Company, Inc., from licensing its name in the recreational vehicle industry. In order to prevent inequity, Kansas courts have found, under an alter ego theory, that a subsidiary corporation can bind its parent. The issue of whether one corporation is but an instrumentality of another is a question of fact. Because of the parent corporation's extensive control over its subsidiary in this case, we hold that the grant of summary judgment must be reversed. We reject the three other claims raised by Coleman Company, Inc.

### Summary of Background Facts

Corporate Entities. This case involves several corporations. They are Coleman Company, Inc.; Coleman Recreational Vehicles, Inc.; Coleman Holdings, Fleetwood Enterprises, Inc.; Fleetwood Folding Trailers, Inc.; Coleman Company, a Delaware corporation; and Consolidated Leisure Industries, L.L.C. Their involvement in the case follows.

The Coleman Company, Inc., is a Kansas corporation (hereafter referred to as Coleman/KS). For some time it had manufactured and sold recreational vehicles such as pop-up tent campers. Anticipating a sale of its recreational vehicle division, in July 1989 it created Coleman Recreational Vehicles, Inc., a Delaware corporation (hereafter referred to as CRVI). CRVI received all assets and liabilities of Coleman/KS recreational division. Then, Coleman/KS transferred its capital stock in CRVI to Coleman Holdings, Inc. (hereafter referred to as Coleman Holdings). Thus,

Coleman Holdings owned all of the outstanding stock of CRVI.

Coleman Holdings agreed to sell all of its capital stock in CRVI to Fleetwood Enterprises, Inc., a Delaware corporation (hereafter referred to as FEI) in December 1989. On December 7, 1989, the parties signed a contract they referred to as the 1989 Stock Purchase Agreement. After the sale, CRVI changed its name to Fleetwood Folding Trailers, Inc. (hereafter referred to as FFT). In 1992, Coleman/KS and Coleman Holdings assigned all assets and liabilities to the Coleman Company, a Delaware corporation (hereafter referred to as Coleman).

### *Some Important Clauses in the 1989 Stock Purchase Agreement*

"5.11 Covenant Not to Compete.

"(a) . . . [A]s an inducement for [FEI] to enter into this Agreement, [Coleman/KS and Coleman Holdings] agree that for a period of three years after Closing, neither [Coleman/KS and Coleman Holdings] or any of their Affiliates shall, without [FEI's] prior written consent, directly or indirectly, (i) own, manage or operate, or join, control or participate in the ownership, management, or operation of, any business which sells products of the type manufactured and sold by [CRVI] on the Closing Date in the United States. *Notwithstanding the foregoing, nothing contained herein shall restrict [Coleman/KS and Coleman Holdings] or any of their Affiliates* from (i) purchasing or making any other investment in any Person which competes with the Business [by CRVI] or does any of the things otherwise prohibited by the preceding sentence through one or more subsidiaries or (ii) purchasing any interest in any Person if, after such purchase, such Person will not be an Affiliate of any of [Coleman/KS and Coleman Holdings], *so long as in any such case such Person does not use the Coleman Name or Coleman Logo.*

. . . .

"6.07 Shared Rights.

. . . .

"(b) Notwithstanding any other provision hereof, with respect to (i) the name 'Coleman' and the registered trademark Coleman (together, the 'Coleman Name'), and (ii) the registered trademarks Coleman in Parallelogram and Coleman in Parallelogram with Lantern Logo (together, the 'Coleman Logo'), *nothing in this Agreement shall be construed as granting [FEI] or [CRVI] any rights to the Coleman Name or the Coleman Logo at common law or otherwise except as provided in the Trademark Licenses [Agreements] annexed as Exhibits A-1* . . . *and the Consent to Use and Register Agreement annexed as Exhibit A-3.*

. . . .

"6.12 Certain Trademark Covenants. [The Negative Covenant.]

"Prior to the Closing, [Coleman/KS and Coleman Holdings] will cause [CRVI] to apply to register the trademark 'Columbia' in the United States for recreational vehicles. On or prior to the Closing Date, [Coleman/KS and Coleman Holdings] will assign, or will cause one or more of their Affiliates to assign, to [CRVI] all right, title and interest of [Coleman/KS and Coleman Holdings] or such Affiliates in any trademark registrations or applications for the use of the name 'Columbia' in connection with tents and recreational vehicles, including, without limitation, all of Outdoor Products' right, title and interest in U.S. Trademark Registration No. 1,303,764 ('COLUMBIA'). *From and after the Closing, [Coleman/KS and Coleman Holdings] will refrain from any use of the trademark registration 'Coleman' in connection with recreational vehicles, except as otherwise contemplated hereby or on products currently sold by Coleman or any of its Affiliates as accessories for recreational vehicles.*" (Emphasis added.)

Two Ancillary Contracts. On December 29, 1989, Coleman/KS and CRVI signed the Consent to Use and Register Agreement and then the Trademark License Agreement (hereafter referred to as the 1989 Trademark License Agreement). Both of these were license-related agreements, listed as exhibits to the 1989 Stock Purchase Agreement. FEI served only as CRVI's guarantor to both agreements and agreed to cause CRVI to abide by the terms of both agreements.

First, the Consent to Use and Register Agreement described the parties' rights and duties concerning the Columbia trademark. Second, the 1989 Trademark License Agreement, granted CRVI a nonexclusive royalty free license permitting use of Coleman's trademarks for 5 years. CRVI's intent in entering these agreements was to license its products under Coleman's trademarks for a limited period of time and then shift to manufacturing and selling recreational vehicles under a new Columbia Parallelogram Trademark, which resembled the Coleman Logo.

1994, 1997, and 2000 Contract Extensions. Prior to the expiration of the 1989 Trademark License Agreement, Coleman and FFT negotiated the continued use of Coleman's trademarks. In 1994, Coleman and FFT executed a Merchandise License Agreement (called the 1994 Trademark License Agreement), which licensed Coleman's trademarks to FFT in exchange for royalties. This agreement did not name FEI as a party or require FEI to

remain FFT's guarantor. The agreement, however, included the following relevant provisions:

"11.0. Effect of Termination or Expiration.

. . . .

"11.2 It shall not be a violation of any right of [FFT] if Coleman should at any time during the Term of this Agreement enter into negotiations with another to license use of the Licensed Trademarks within the Territory, provided that it is contemplated that such prospective license shall commence after termination or expiration of the license granted under this Agreement."

After amending the 1994 Trademark Agreement to extend its expiration term, Coleman renewed the license to its trademarks to FFT in 1997 and 2000, executing separate agreements (1997 Trademark License Agreement; 2000 Trademark License Agreement) with FFT. Both agreements also provided the provision that upon the termination of the Trademark License Agreements with FFT, Coleman retained the right to license its trademarks to other manufacturers.

Business relations between the companies broke down in 2003 when Coleman ended its relationship with FFT, alleging that FFT failed to remedy its breaches to the 2000 Trademark License Agreement. As a result, Coleman made a license agreement with Consolidated Leisure Industries, L.L.C., doing business as Coachmen RV Group (hereafter referred to as Coachmen) in January 2004. In that agreement, Coleman licensed its trademarks for Coachmen to use in connection with recreational vehicles. This led to legal action.

*District Court Lawsuit*

Requesting injunctive relief, FEI filed a petition in Sedgwick District Court, claiming that Coleman had breached paragraph 6.12 (the Negative Covenant) of the 1989 Stock Purchase Agreement. Granting summary judgment, the district court ruled in favor of FEI, holding that Coleman had indeed breached the Negative Covenant when it entered into a license agreement with Coachmen. The court then permanently enjoined Coleman from using or licensing its trademarks to persons or entities engaged in the recreational vehicle industry.

At the summary judgment hearing, both parties agreed that the 1989 agreements were unambiguous. The dispute centered on the Negative Covenant's legal effect. After examining both arguments, the court ruled in favor of FEI, holding that FEI was a party only to the 1989 Stock Purchase Agreement and, therefore, Coleman remained bound to those terms, which then were breached when Coleman licensed its trademarks to Coachmen.

In this appeal Coleman makes four general claims.

- *Incorrect Interpretation.* In three ways, the district court made an erroneous interpretation of the Negative Covenant.
- *Release.* FEI's conduct released Coleman from complying with the Negative Covenant.
- *Estoppel.* The doctrine of estoppel prevents FEI from asserting its rights under the Negative Covenant.
- *Alter Ego.* FFT was the alter ego of FEI and therefore the contract was binding on FEI.

*Choice of Law and Appellate Review of Summary Judgment*

Paragraph 13.06 of the 1989 Stock Purchase Agreement states that any interpretation of the agreement must be made in accordance with New York law. Similarly, paragraph 17 of the Consent to Use and Register Agreement and paragraph 8.1 of the 1989 Trademark License Agreement, by incorporating paragraph 13.06 of the 1989 Stock Purchase Agreement into its agreement, established New York as the governing jurisdiction. Both parties have agreed that Kansas law is the same as New York law on all points relevant to this case. Therefore, there is no choice of law problem here. This court will use Kansas law, unless other cases need to be used.

Moving on to the rules of summary judgment, it is well established:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to estab-

lish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

Furthermore, in cases where there are undisputed facts, appellate review of the district court's grant of summary judgment is de novo. *Botkin v. Security State Bank*, 281 Kan. 243, 248, 130 P.3d 92 (2006).

In its summary judgment order, the district court ruled that FEI was only a party to the 1989 Stock Purchase Agreement. Therefore, the district court held that

"a straight-forward reading of the entire 1989 Stock Purchase [A]greement in conjunction with all ancillary agreements leads to one reasonable interpretation: Coleman plainly agreed to forego use of the Coleman trademark perpetually when it sold [CRVI] to FEI. Nothing in the 1989 documents can reasonably be read as reserving to Coleman, the right to resume use of the Coleman name in the RV industry after five years."

We now review Coleman's arguments in order.

### Incorrect Interpretation

Coleman claims that the district court's interpretation of the Negative Covenant was incorrect for three reasons. First, Coleman argues that the district court should have interpreted the Negative Covenant from both the 1989 Stock Purchase and Trademark License Agreements together because they were part of the same series of transactions concerning its right to use and license its trademarks in the recreational vehicle industry. Second, Coleman contends that the district court should not have severed the provisions of the 1989 Stock Purchase Agreement that were expressly integrated and merged into the 1989 Trademark License Agreement between Coleman and FFT. Third, Coleman asserts that the Negative Covenant intended to prevent only the Coleman Logo from being used in the recreational vehicle industry because of its similarity to the Columbia Parallelogram Trademark. We examine Coleman's claims in that order.

Several contracts to be read together. Our law concerning multiple agreements is both robust and practical. "A court may ascertain the existence and terms of an agreement from a combination of written instruments and the acts of the parties in connection therewith." *Ed Bozarth Chevrolet, Inc. v. Black*, 32 Kan. App. 2d 874, 880, 96 P.3d 272 (2003). Furthermore, "documents which are executed at different times, but in the course of the same transaction concerning the same subject matter, will be construed together to determine the intent of the parties to the contract." *Parsons v. Biscayne Valley Investors Ltd.*, 23 Kan. App. 2d 718, 723, 935 P.2d 218 (1997).

We take this rule to mean that this court may only interpret the Negative Covenant from the 1989 Trademark License Agreement in combination with the 1989 Stock Purchase Agreement *if* it is established that FEI and CRVI were the same parties to both agreements.

But the parties to the 1989 Stock Purchase Agreement were Coleman and FEI, with CRVI being the entity to be purchased. Accordingly, CRVI cannot be a party to the 1989 Stock Purchase Agreement. Therefore, Coleman's argument must rely upon whether FEI can be construed to be a party to the 1989 Trademark License Agreement, an ancillary contract signed on the same day.

The 1989 Trademark License Agreement did not name FEI as a party to the agreement. In addition, FEI was described in the contract as CRVI's guarantor. That fact does not make FEI a party to that agreement:

"The law of guaranty is a part of the law of contracts; a guaranty is a type or kind of contract. For a guaranty there must be at least three parties: a guarantor, a creditor (the individual to whom the promise is made), and a debtor. The guaranty is an obligation collateral to another contractual duty to perform. *The contract of the guarantor is a separate contract. It is in the nature of a warranty by the guarantor that the thing guaranteed to be accomplished by the principal shall be done, and is not an engagement jointly with the principal to do the act.* [Citation omitted.]" (Emphasis added.) *Iola State Bank v. Biggs*, 233 Kan. 450, 452-53, 662 P.2d 563 (1983).

Because FEI's role in the 1989 Trademark License Agreement was limited to being a guarantor, FEI cannot be construed as a

party to that agreement. Furthermore, Coleman has not demonstrated otherwise. They have brought forth no evidence that shows CRVI committed any breach of the contract that would require FEI's active participation in the 1989 Trademark License Agreement in their capacity as guarantor, standing in CRVI's shoes. Consequently, this court is limited to interpreting the Negative Covenant from the agreement in which both Coleman and FEI were parties, the 1989 Stock Purchase Agreement.

Merger of the two agreements. Alternatively, Coleman requests this court to apply the merger doctrine and interpret the Negative Covenant from only the 1989 Trademark License Agreement. In Coleman's words:

"The 1989 Trademark License [Agreement] delivered at closing was the last iteration of the agreement of the parties and it *expressly integrated and merged* the [1989] Stock Purchase Agreement into the 1989 Trademark License Agreement as part of the 'entire agreement' of the parties on its subject matter. . . . Because the Stock Purchase Agreement provisions were *merged* into the License Agreement, it did not have a separate existence or separate effect as a stand-alone agreement, and it could not spring back to life as a separate, stand-alone years later when the last superseding License Agreement terminated in 2003." (Emphasis added.)

Determining the applicability of the doctrine of merger involves mixed questions of law and fact. The interpretation and effect of legal instruments are questions of law. However, since the merger doctrine is based on the intention of the parties, the determination of the intent of the parties is a question of fact, found from the contracts as well as the facts and circumstances surrounding their execution. *Avien Corp. v. First Nat'l Oil, Inc.*, 32 Kan. App. 2d 106, 111, 79 P.3d 223 (2003).

Implicit in these rules is the requirement that the final expression of the parties concerns (1) the *same parties* and (2) the same subject matter. See 17A C.J.S., Contracts § 416, p. 499 (that "[W]hen two contracts are in conflict, the legal effect of a subsequent contract made by the same parties and covering the same subject matter, but containing inconsistent terms, is to rescind the earlier contract. The subsequent contract, then, becomes a substi-

tute for the earlier contract and is the only agreement between the parties upon that subject.").

We have already determined that FEI was not a party to the 1989 Trademark License Agreement. Therefore, contrary to Coleman's argument, the 1989 Trademark License Agreement cannot be merged with the 1989 Stock Purchase Agreement. Because there are different parties to the contracts, that means the contracts cannot merge.

Only the Coleman Logo. Coleman challenges which trademarks it should be enjoined from using in the recreational vehicle industry. It argues that the parties intended a "FEI/FFT transition to a 'Columbia' trademark *similar in appearance* to the specific trademarks licensed from Coleman, and *Coleman would cease using in the RV industry those specific trademarks."* (Emphasis added.)

In response, FEI contends that the parties crafted the Negative Covenant to permanently remove Coleman as a competitive force in the recreational vehicle market. This removal, FEI asserts, included the Coleman Name.

Examining the 1989 Stock Purchase Agreement in its entirety, it appears to us that the parties intended for the "trademark registration 'Coleman' " to encompass the Coleman Name. Paragraph 5.11(a) of the 1989 Stock Purchase Agreement states that the covenant not to compete is included as "an inducement for [FEI] to enter into [the 1989 Stock Purchase Agreement]." After 3 years, the parties agreed that Coleman could compete in the recreational vehicle industry through a third party, "so long as in any such case such Person *does not use the Coleman Name or Coleman Logo."* (Emphasis added.)

Paragraph 6.07(b) of the agreement defines the "Coleman Name" and "Coleman Logo" as "(i) the name 'Coleman' and the *registered trademark Coleman* (together, the 'Coleman name'), and (ii) the *registered trademarks Coleman* in Parallelogram and Coleman in Parallelogram with Lantern Logo (together, the 'Coleman Logo')." (Emphasis added.)

The Negative Covenant reinforces the paragraph 5.11(a) covenant by stating that after closing, Coleman will refrain from "any use of *the trademark registration 'Coleman'* in connection with

recreational vehicles, except as otherwise contemplated hereby." (Emphasis added.) The parties have contemplated this exception in paragraph 6.07(b), which refers to CRVI/FFT's licensing of the Coleman Trademarks.

Therefore, examining the provisions in the 1989 Stock Purchase Agreement together, the Negative Covenant not only enjoins Coleman from using the Coleman Parallelogram, with or without the Lantern Logo, but also enjoins Coleman from licensing the Coleman Name to third parties for use in the recreational vehicle industry. We conclude that there was no misinterpretation of the agreement by the district court as Coleman contends.

### Release by Partial Performance

Coleman argues that FEI's active participation in the 1994 Trademark License Agreement constituted a mutual agreement to terminate the Negative Covenant.

Our Kansas courts have limited the application of the doctrine of partial performance only to contracts involving land. See *Wells v. State Bank of Kingman*, 24 Kan. App. 2d 394, 396, 945 P.2d 418 (1997). Therefore, Coleman analyzes this doctrine under the laws of New York. "Where the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement." *Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 539, 44 P.3d 364 (2002). Therefore, since the parties in the 1989 Stock Purchase Agreement adopted New York law as its governing authority, we analyze this issue under the laws of the New York.

New York General Obligations Law § 15-301(1) (McKinney 2001) states:

"A written agreement or other written agreement *which contains a provision to the effect that it cannot be changed orally*, cannot be changed by an executory agreement *unless* such executory agreement is in *writing* and *signed* by the party against whom enforcement of the change is sought or by his agent." (Emphasis added.)

However, "[p]artial performance of an oral agreement to modify a written contract, *if unequivocally referable to the modification*, avoids the statutory requirement of a writing." (Emphasis added.)

*Rose v. Spa Realty Assoc.*, 42 N.Y.2d 338, 341, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977). In other words, "the court may consider not only past oral exchanges, but also the conduct of the parties. *But only if the partial performance be unequivocally referable to the oral modification is the requirement of a writing under section 15-301 avoided.*" (Emphasis added.) 42 N.Y.2d at 343-44.

In this case, Coleman alleges that FEI's participation in FFT's negotiations for the 1994 Trademark License Agreement constituted a mutual agreement to terminate the Negative Covenant. Here is the information from the record that specifically refers to the Negative Covenant:

- **October 23, 1992, Letter from Pat Scanlon**, Division General Manager, on FFT's letterhead.

  "Based on our purchase and trademark agreements Coleman cannot license the Coleman trademark to another folding trailer manufacturer. If [FFT] discontinues the use of the Coleman mark it will be lost forever—benefiting neither of our companies."

- **Deposition of Forrest D. Theobald** taken on behalf of Coleman.

  "Q: And are you aware of anything, any subsequent agreement to which FEI and Coleman are a party that would have authorized Coleman, in light of the negative covenant that you indicated you believe exists, would have authorized Coleman to extend a continued license to FFT after the limited term license expired?

  . . . .

  "A: Yeah. There [were] subsequent licensing agreements.

  "Q: And you're saying that it is the subsequent licensing agreements that gave Coleman the right to continue to license its name to FFT?

  "A: Well, what I'm saying is that sometime subsequent to the stock sale agreement, Coleman, Coleman companies and [FEI] recognized that it would be in the best interests of those parties to continue the licensing agreement."

- **Transcript of Temporary Injunction, Larry Marsh's testimony**.

  "Q: And as part of your attempt to negotiate it, Mr. Scanlon talked about the fact that you could simply just start using the Columbia name—and, in fact, in paragraph six, he says that if you guys did that, that would take the Coleman name out of the market place forever; right?

"A: Yes.

"Q: And given that negotiation point that Fleetwood had, Fleetwood and Coleman entered into a new agreement that replaced the agreements that were entered into in 1989, that instead gave Fleetwood the continued right to use the Coleman name, something it had not negotiated for in 1989; right?

. . . .

"A: I can't say that they replaced other agreements. They were new agreements. But I can't sit here and say that we believed that they would replace things that were agreed to in the past. The fact that—that Coleman could license the brand to someone else would certainly weaken our position. Why would there be of any value to use to enter into an agreement where we didn't have exclusive rights to the Coleman name?"

- **March 29, 1994, Letter from Glenn F. Kummer**, President, on FEI's letterhead.

    "As the period of five years is near completion, I would like to ask you to consider an extension of our use of the Coleman name as we feel it would benefit both companies.

    . . . .

    "Should Fleetwood continue with the Coleman name on our folding trailers, The Coleman Company would recognize the following benefits.

    "1. Access to the RV Industry - the purchase of the folding trailer division precludes the Coleman Company from entering this business segment.

    . . . .

    "Pat Scanlon, our Folding Trailer Division General Manager, and Larry Sanford, have had an initial telephone discussion regarding the possibility of continuing with the name. I ask that you encourage these discussions and help both our companies find ways to continue this mutually beneficial relationship."

- **Deposition of Glenn Kummer**, FEI's former President and member of its board of directors.

    "Q: It's fair to say, sir, that given the content of this letter, the context of the letter and the form of the letter in March of 1994, you were intervening in your capacity as president of [FEI] and asking the chairman and CEO of Coleman Company to figure out a way to help both your companies continue the beneficial relationship.

    "A: The beneficial relationship, sure. That we would be able to continue to use the Coleman name.

    "Q: And in fact, subsequent to your letter within about two months of your letter, a new agreement was reached between your two companies, right?

"A: We were then able to continue to use the name under the new agreement, yeah."

We reiterate that FEI was not a named party to the 1994 Trademark License Agreement. Furthermore, the 1994 Trademark License Agreement did not make any references to the Negative Covenant or the 1989 Stock Purchase Agreement. Additionally, the 1994 Trademark License Agreement contained a merger clause.

These facts do not lead us to conclude that FEI consented to modifying the Negative Covenant. Rather, the evidence demonstrates that FEI reminded Coleman of the existence of the Negative Covenant and the benefit Coleman would receive if it renewed its license of trademarks with FFT. Therefore, since FEI's conduct did not *unequivocally* refer to any modification of the Negative Covenant, we reject Coleman's request to apply the doctrine of partial performance. In other words, in the absence of any writing, FEI did not terminate the Negative Covenant.

### Estoppel

Coleman argues that FEI is precluded from asserting any rights under the Negative Covenant. *First*, Coleman claims that FEI's officers, in their capacity as FFT's officers, allowed Coleman to believe that clauses such as paragraph 11.2 of the 1994 Trademark License Agreement were effective. *Second*, Coleman alleges that FEI acquiesced to Coleman's violation of the Negative Covenant by failing to object to Coleman's renewed license of its trademarks to FFT after the expiration of the 1989 Trademark License Agreement.

Standard of Review for Equitable Estoppel. Here, Coleman states that this court's standard of review is de novo because the district court denied this issue on summary judgment. But, since there are no material facts in dispute, the district court has discretion whether to invoke the equitable estoppel doctrine. Therefore, appellate review concerning this appeal is by an abuse of discretion. See *Shaffer v. City of Topeka*, 30 Kan. App. 2d 1232, 1236, 57 P.3d 35 (2002) ("The application of an equitable doctrine [including the doctrine of equitable estoppel] rests within the sound discretion of the district court."); *Robinson v. Shah*, 23 Kan. App. 2d 812, 829,

936 P.2d 784 (1997) ("Equitable estoppel does not depend upon legislative authority; it is an inherent power of the courts used to punish unconscionable conduct and estop a guilty party from taking advantage of his or her fraudulent conduct."); *Toshiba Master Lease, Ltd. v. Ottawa University*, 23 Kan. App. 2d 129, 135, 927 P.2d 967 (1996) ("Kansas law is very clear—equitable estoppel does not arise out of contract but is based upon concepts of morality and justice.").

Rules of Estoppel. Each case where the doctrine of equitable estoppel is raised as a defense must depend on its own facts. *Toshiba Master Lease*, 23 Kan. App. 2d at 135. " 'The doctrine of equitable estoppel is based upon the principle that a person is held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances, has in good faith relied thereon.' [Citation omitted.]" *Hartford Underwriters Ins. Co. v. Kansas Dept. of Human Resources*, 272 Kan. 265, 276, 32 P.3d 1146 (2001).

A claim of equitable estoppel will fail unless a party can prove (1) he or she was induced to believe certain facts existed by another party's acts, representations, admissions, or silence when the other party had a duty to speak, (2) he or she relied and acted upon such belief, and (3) he or she would now be prejudiced if the other party were allowed to deny the existence of such facts. Those facts cannot be ambiguous or subject to more than one construction. *Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 116, 991 P.2d 889 (1999). Furthermore, if any essential element thereof is lacking or is not satisfactorily proved, there can be no equitable estoppel. *Gillespie v. Seymour*, 250 Kan. 123, 129-30, 823 P.2d 782 (1991).

In this case, the district court denied Coleman's claim for equitable estoppel based on the following determinations. First, the district court determined that FEI's initial position in the negotiation for the extended licensing arrangement with Coleman was that Coleman only had the right to license its trademarks to FFT. From that determination, the district court concluded that "FEI had never taken a contrary position or entered into any agreement modifying that stance." Second, the district court noted that even

under the assumption that the "elements of equitable estoppel were met, Coleman [has been] unable to show inequitable consequences, prejudice or detrimental reliance."

Furthermore, the district court ruled that Coleman failed to provide evidence to support that FEI made any false representations or concealed material facts: (1) Coleman knew FEI and FFT were separate corporations; (2) FEI had asserted to Coleman that Coleman did not possess the right to license its trademarks to any company in the recreational vehicle industry other than FFT; and (3) "Coleman had the means to verify FEI's position on the issue by including FEI in the written agreements with FFT."

Therefore, the district court held:

"In the absence of a false or misleading affirmative representation or concealment, Coleman has no facts which warrant invoking an equitable doctrine to modify its written agreements. Coleman cannot show that it changed its position to its irreversible detriment in reliance on FEI's failure to object to the licensing agreement. Coleman's position with respect to licensing another company in the [recreational vehicle industry] is the same now as it would have been had it not licensed FFT in 1994, 1997, or 2000."

Judicial discretion is abused when no reasonable person would take the view adopted by the district court. *Shaffer*, 30 Kan. App. 2d at 1236. Furthermore, the party asserting the trial court abused its discretion has the burden of proving such abuse of discretion. *Board of Reno County Comm'rs v. Akins*, 271 Kan. 192, 195, 21 P.3d 535 (2001).

Here, the district court's findings were reasonable. Furthermore, FEI could not have acquiesced to a violation of the Negative Covenant when Coleman relicensed its trademarks to FFT because, under paragraph 6.07(b), the parties had contemplated the licensing of Coleman's trademarks to FFT to be the exception to the Negative Covenant. In addition, under paragraph 13.02 of the 1989 Stock Purchase Agreement, Coleman was aware that any failure by FEI to insist upon strict compliance with the agreement's covenants did not operate as a waiver or estoppel. It follows then that Coleman has failed to meet its burden that the district court abused its discretion when it refused to apply the doctrine of eq-

uitable estoppel. Accordingly, no abuse of discretion has occurred here.

## Alter Ego

In concise terms, courts will ignore corporate names to counter injustice in cases where the parent corporation exerted such dominion and control over its subsidiaries that they were not separate and distinct corporate entities but one and the same under an alter ego analysis. See *Hoffman v. United Telecommunications, Inc.*, 575 F. Supp. 1463, 1478 (D. Kan. 1983). The determination of whether a subsidiary corporation is an instrumentality of the parent is a question of fact. See *Doughty v. CSX Transportation, Inc.*, 258 Kan. 493, 498, 905 P.2d 106 (1995), (citing *Schmid v. Roehm GmbH*, 544 F. Supp. 272, 275 [D. Kan. 1982]).

Within a subsidiary corporation context, which is pertinent here, our Supreme Court in *Doughty* at 499, listed 10 factors that should be considered when deciding if the alter ego doctrine should apply:

1. The parent corporation owns all or a majority of the capital stock of the subsidiary;
2. The corporations have common directors or officers;
3. The parent corporation finances the subsidiary;
4. The parent corporation subscribed to all of the capital stock of the subsidiary or otherwise caused its incorporation;
5. The subsidiary has grossly inadequate capital;
6. The parent corporation pays the salaries or expenses or losses of the subsidiary;
7. The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;
8. In the papers of the parent corporation and in the statements of its officers, the subsidiary is referred to as such or as a department or division;
9. The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and
10. The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

Coleman argues that FFT was an alter ego of FEI. Coleman contends that the district court erred in ruling that FEI was not bound to the Trademark License Agreements made by FFT. Citing the alter ego theory, Coleman asserts that FEI, as a parent corporation, authorized FFT, as its subsidiary, to enter into the 1994, 1997, and 2000 Trademark License Agreements.

A review of the large record in this case reveals that many of the 10 factors listed in *Doughty* can be answered yes and some cannot be answered because either the record is unclear or silent on the point as follows: (1) FEI owns all of FFT; (2) The two corporations have common directors and officers (although it is not clear that all are the same); (3) Finances appear to flow from FEI to FFT, with FFT liabilities insured by FEI; (4) The parent corporation, FEI, bought all of CRVI assets and liabilities and then renamed the corporation FFT; (5) The adequacy of FFT capital is not clear in the record; (6) FEI is responsible for losses of FFT; (7) The extent of FFT's assets is not clear, but whatever it has is owned by FEI; (8) FEI refers to FFT as a division, *i.e.,* "RV Group," in press releases; (9) The directors of FFT have acted in accord with FEI directions when negotiating the terms of the contracts here; (10) The formal legal requirements for creation of FFT have been met.

These answers lead this court to conclude that summary judgment on this point should not have been granted. Whether FFT is the alter ego of FEI or vice versa is a question of fact. We can see the injustice perceived by Coleman. In its view, it negotiated with a parent corporation, FEI, a limited restraint from trademark licensure as an inducement to enter the 1989 contract. And then, over 15 years, with new negotiations and new contracts with a wholly owned subsidiary of that company, FFT and Coleman reached three agreements for trademark use in exchange for royalty payments.

Now Coleman is told by the parent corporation that its subsidiary was acting on its own and not as the alter ego of FEI, and FEI insists that Coleman's agreement to refrain from licensure of its trademarks is still enforceable. This seems especially inequitable because each of the extension contracts had express language that permitted Coleman to negotiate with others for the licensure of its

name and logo, even in the same trade area, as long as any such licensure started after the expiration date of the extension (see paragraph 11.2 of the 1994 Trademark Licensure Agreement for example).

The facts may prove the opposite. A trial on the question will settle the matter. We therefore remand the case to the district court for further proceedings on the alter ego issue.

Affirmed in part, reversed in part, and remanded with directions.