No. 115,126

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ED DEWITTE INSURANCE AGENCY, INC., *et al.*,
*Appellants*,

v.

FINANCIAL ASSOCIATES MIDWEST, INC., *et al.*,
*Appellees.*

SYLLABUS BY THE COURT

1.

Written contracts are interpreted in accordance with the parties' intent, which is determined from the terms of the contract itself when those terms are unambiguous.

2.

Under the statute of frauds, certain types of contracts must be in writing to be enforceable. One type of contract covered by the statute of frauds is a contract that cannot be performed within 1 year. This applies when it is impossible to perform the contract within 1 year.

3.

Under an exception to the statute of frauds, an oral contract may still be enforced if the party seeking to enforce it has already fully performed under the contract. This exception does not apply when an independent third party still must take some action to continue or complete the contract.

4.

The duty of good faith and fair dealing is implied in every Kansas contract except ones for employment at will. But this duty exists only in relation to the performance of a specific contract term, not as a stand-alone cause of action.

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed December 16, 2016. Affirmed.

*Michael L. Blumenthal, Walter M. Brown*, and *Kevin J. Karpin*, of Seyferth Blumenthal & Harris LLC, of Kansas City, Missouri, for appellants.

*William S. Robbins, Jr.,* and *Christopher L. Johnson*, of Polsinelli PC, of Kansas City, Missouri, for appellees.

Before SCHROEDER, P.J., LEBEN and GARDNER, JJ.

LEBEN, J.: Beginning in the 1980s, Edward DeWitte, Leonard Filley, and Barbara Meador worked for Financial Associates Midwest, Inc., recruiting and managing agents who sold health-insurance policies, including Blue Cross Blue Shield of Kansas City policies. In 1994, Blue Cross and Financial Associates entered an administrative-services agreement under which Blue Cross paid an override fee to Financial Associates—2% of all insurance premiums that Blue Cross collected on policies sold by Financial Associates agents. The owner of Financial Associates then promised to pay DeWitte, Filley, and Meador half of that override fee in exchange for their managerial work. According to DeWitte, Filley, and Meador, Financial Associates also promised to pay that 1% override fee as a "vested renewal commission," meaning they would continue receiving the payments even after they didn't work for Financial Services anymore.

Blue Cross bought Financial Associates in late 2011, and in September 2012, Financial Associates offered DeWitte, Filley, and Meador new employment terms, which

they turned down. They no longer work for Financial Associates, and Financial Associates has stopped paying them the 1% override, which they have alleged is a breach of their employment contract. The district court disagreed and granted summary judgment for Financial Associates.

On appeal, DeWitte, Filley, and Meador first argue that Financial Associates owes them the 1% override payments under the terms of their written area-manager contracts. But the language of those contracts clearly and unambiguously only governs compensation for the direct sale of insurance policies; it doesn't use the term "override" or mention any managerial responsibilities or compensation. The evidence shows that an override fee is not the same as a commission, and the contracts only govern commissions.

Next, DeWitte, Filley, and Meador argue that even if we find that the override agreement wasn't part of the written contracts, it's an enforceable oral agreement. But under the Kansas statute of frauds, contracts that can't be performed in less than 1 year are only enforceable if they are in writing. Here, the override payments are linked to and calculated based on insurance premiums Blue Cross collects on renewed insurance policies originally sold by Financial Associates agents. Since insurance policies are annual, renewed only after a full year, the oral agreement can't be performed in less than 1 year.

DeWitte, Filley, and Meador next argue that we should enforce the agreement anyway because they have fully performed under the oral agreement, and full performance is an exception to the writing requirement of the statute of frauds. It's true that DeWitte, Filley, and Meador did fully perform while they worked for Financial Associates, and they claim that they are entitled to the 1% override without doing any additional work. But the full-performance exception only applies when the only thing left under the contract is for Financial Associates to pay DeWitte, Filley, and Meador, and here, something else needs to occur—the policyholders have to decide to renew their

3

policies to create the premiums from which the override is calculated. Different states have answered this question differently, and Kansas courts haven't considered this question before, but we find that under these circumstances, the full-performance exception doesn't apply because Financial Associates' performance depends on the decisions of independent third parties.

So Financial Associates didn't breach any contracts with DeWitte, Filley, and Meador, and we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

This case comes to us after the district court granted the defendants' motion for summary judgment; the facts aren't substantially in dispute.

In 1976, Charles Stumpf founded Financial Associates (now doing business as Canopy, Inc.), a company that sold health-insurance policies through a network of independent agents. In the 1980s, as the company grew, Stumpf hired DeWitte, Filley, and Meador—the plaintiffs in this case—as area managers, and they each signed an area-manager contract.

As area managers, DeWitte, Filley, and Meador focused on recruiting, training, and supporting Financial Associates' agents, who sold insurance policies; they sold very few policies themselves. Stumpf assigned the agents to DeWitte, Filley, and Meador, who supervised the agents, answered questions, and provided administrative support for them.

As is traditional in the insurance industry, the agents were paid on commission for selling insurance policies—when an agent sold a policy, the insurance carrier paid the agent a percentage of that policy's premium. And every time that policy was renewed, the agent would receive another commission. Under their contracts, the renewal commissions

4

were "vested," meaning the agents would receive these renewal commissions even if they no longer worked for Financial Associates.

Financial Associates first started doing business with Blue Cross in the early 1990s. In 1994, because Financial Associates was selling so many Blue Cross policies, it became a "Blue Chip" agency for Blue Cross. This meant that Blue Cross began paying Financial Associates an administrative-services fee to subsidize some of its administrative costs. This fee—2% of all the Blue Cross premiums on policies that had been sold by Financial Associates agents—was called an "override," and it was governed by an administrative-services agreement between Blue Cross and Financial Associates that was renewed annually.

Around the same time (after DeWitte, Filley, and Meador had worked at Financial Associates for between 6 and 12 years), Stumpf agreed that Financial Associates would pay DeWitte, Filley, and Meador half of the Blue Cross administrative-services fee—a 1% override—in exchange for their work as area managers. And for around 20 years, Financial Associates regularly did that.

Stumpf also orally agreed to pay DeWitte, Filley, and Meador this 1% override as a "vested renewal commission"—in other words, they would continue receiving the override payment even after they weren't employed by Financial Associates anymore, until the Blue Cross policies sold by agents they had supervised were no longer renewed.

But soon after Stumpf sold Financial Associates to Blue Cross, Blue Cross decided to stop paying Financial Associates the 2% override fee. (At oral argument, the parties indicated that Blue Cross actually continued making the payment. In the summary-judgment motion in the district court, the defendants alleged that Blue Cross decided in June 2012 to stop making the payment; the plaintiffs admitted that allegation.)

5

Financial Associates continued paying the 1% override to DeWitte, Filley, and Meador for a few more months. Then, Financial Associates—owned by Blue Cross—offered them new employment terms of a set salary plus bonus potential, but they had to release their alleged rights to the 1% override. Meador and DeWitte rejected the offer, and their employment was terminated. Filley had retired (after the sale to Blue Cross but before Financial Associates quit paying the override payments), and Financial Associates also offered him the new employment terms, even though he was retired. He also declined. At the time of their separation from Financial Associates, DeWitte, Filley, and Meador were each making between $12,000 and $20,000 per month, exclusively from the 1% override payments.

After leaving Financial Associates, DeWitte, Filley, and Meador filed this lawsuit against Financial Associates and Blue Cross, alleging that the area-manager contracts require Financial Associates to continue paying them the 1% override as "vested renewal commissions." Both parties moved for summary judgment, or a decision from the court without a trial.

After a hearing, the district court granted the defendants' motion for summary judgment and denied the plaintiffs' motion. DeWitte, Filley, and Meador filed a motion to alter or amend the judgment, which the district court also denied.

DeWitte, Filley, and Meador have appealed to our court.

ANALYSIS

The standards for summary judgment are well known:

"'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no

6

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 622, 345 P.3d 281 (2015).

I. *The Written Area-Manager Contracts Don't Govern the 1% Override Payments.*

DeWitte, Filley, and Meador first argue that Financial Associates breached the area-manager contracts when it stopped making the 1% override payments because those payments are "vested renewal commissions" under the plain terms of the area-manager contracts.

We have unlimited review over the interpretation and legal effect of written contracts and owe no deference to the district court's interpretation of those contracts. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014).

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.'" *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013) (quoting *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 [2007]). Further, we interpret contractual provisions by construing and considering the entire document, not by isolating any particular sentence or provision. We favor reasonable interpretations and avoid results that negate the

7

purpose of the agreement. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013).

DeWitte, Filley, and Meador each signed identical "Area Managers Contracts" with Financial Associates. Except for the title, the area-manager contracts are identical to all other contracts that Financial Associates had with its agents, and the area-manager contracts don't actually set out the duties or responsibilities of an area manager. Instead, the contracts describe the role and compensation of a regular agent who directly sells insurance policies.

Paragraph 1 of the contracts authorizes the area managers to sell insurance policies and collect insurance premiums as independent contractors for Financial Associates.

Paragraph 2 describes how the area managers (here referred to as "agents") would be compensated: "The Agent . . . shall receive *as full compensation* for expenses and for his services, *commissions and renewal commissions on premiums paid on policies issued on applications secured by said Agent*, or his sub-agents, according to the following schedule." (Emphasis added.) In other words, when an agent successfully got a customer to sign up for an insurance policy, that agent was paid a percentage of the insurance premium paid by that customer—the exact percentage varied depending on the insurance carrier and was usually set forth in a separate document (attached to the contract) called a "commission schedule." The agent would also receive a commission if and when a policyholder renewed a policy that the agent had sold.

When DeWitte, Filley, and Meador signed their contracts, no commission schedules were attached. But they each later signed Blue Cross commission schedules. Like the area-manager contracts generally, these schedules only set forth compensation related to selling insurance policies directly and don't mention compensation for work as managers.

8

Paragraph 3 of the area-manager contracts provides that an agent's commissions for direct sales of insurance policies are "vested"—in other words, the agent would receive a commission every time a policyholder renewed a policy that the agent had sold, even if the agent didn't work for the agency anymore and even if the agent was dead (in which case the commission would go to the agent's spouse or estate):

> "This contract shall be terminated by the death of the Agent and all renewal commissions payable as provided herein shall be vested and payable to the surviving spouse of the Agent. If there is no surviving spouse or if the spouse dies prior to receiving all renewal commissions payable hereunder, then such renewal commissions shall be paid to . . . the Agent's Estate. . . . The Agent's right to receive all renewal commissions that may accrue on account of policies issued on applications secured by the Agent or his sub-agents shall be vested and payable to the Agent after termination of this contract unless such renewal commission in any one month amounts to less than $100, in which case, no further renewal commission shall be payable."

Paragraph 11 of the area-manager contracts states that the commission schedule sets out the agent's total compensation and can't be modified except in writing:

> "The Agent shall . . . be allowed as full compensation hereunder, unless otherwise expressly stipulated in writing by the Agency, the attached schedule of commissions on the first and renewal years' cash premiums which shall be obtained, collected, paid to and accepted by the Company on policies of insurance effected with the Company by the Agent under this agreement[.]"

So the area-manager contracts (and the Blue Cross commission schedules signed later) only covered commissions for the direct sale of insurance policies. DeWitte, Filley, and Meador were not primarily engaged in selling policies themselves, and the dispute in this case isn't about commissions for the direct sale of insurance policies—everyone

9

agrees that DeWitte, Filley, and Meador have been and continue to be properly compensated under the terms of their contracts for the few policies that they sold directly.

Instead, this case is about how DeWitte, Filley, and Meador were compensated for their work as area managers. Everyone agrees that Financial Associates paid DeWitte, Filley, and Meador half of the Blue Cross override fee for around 20 years. And according to DeWitte, Filley, and Meador, the 1% override payments are "commissions" under the terms of the contract and thus are vested and owed to them as long as policies obtained by the agents they supervised are renewed. So is the 1% override payment a commission?

First of all, we note that the parties signed the area-manager contracts long before the 1% override payments began—the contracts were signed in the 1980s, and the override payments started around 1994. This makes it less likely that the contracts addressed the override payments. There's also no commission schedule addressing the override, despite Stumpf's statement that he thought there used to be one.

Second, commissions are linked to the insurance premiums collected by the insurance carrier—the agent receives a percentage of the premium as his or her commission. Similarly, the override is also linked to insurance premiums—it's a percentage of all the premiums paid on Blue Cross policies sold by Financial Associates agents. But the similarity ends there. The insurance carrier pays commissions directly to the agent (although the money does pass through Financial Associates), and commission schedules attached to the agents' contracts govern those commission payments. The commissions in this case are vested—agents receive a commission every time a policy they sold is renewed, even if they no longer work for the agency. But the override is governed by a separate contract between Blue Cross and Financial Associates. Blue Cross, the insurance carrier, paid the override fee directly to Financial Associates in exchange for its administrative services related to selling Blue Cross insurance policies,

10

such as training agents to sell the policies, comparing Blue Cross policies to other companies' policies, and reviewing insurance applications for mistakes before submitting them to Blue Cross: "The Fee is considered by [Blue Cross] to be a portion of [Blue Cross'] administrative expenses overhead, as it is paid to [Financial Associates] in consideration for [Financial Associates'] performance of administrative duties that otherwise would be performed by [Blue Cross] employees or contracted to another third party." So while the amount of the fee was calculated based on insurance premiums, the fee itself was for Financial Associates' administrative services. Additionally, this administrative-services contract was subject to termination and renegotiation with 30 days' notice by either party—there's no "vested" aspect to the override fee because it's subject to change.

Because the override fee was connected to premiums, Stumpf at one point tried to characterize the 1% override payments as "commissions." But when Stumpf was preparing to sell Financial Associates to Blue Cross, he annotated a list of the company's employees with their job titles and how they were compensated: for some employees he wrote "Sales—Comm. Only," and for DeWitte, Filley, and Meador, he wrote "Brokerage Mgr., No Salary, % of Override Only." In a deposition, Stumpf said that DeWitte, Filley, and Meador were paid only by the override percentage and distinguished the agents who were paid by commission for directly selling policies, so Stumpf knew and acknowledged that "override" and "commissions" are not the same.

By their plain language, then, the area-manager contracts cover only commissions for the direct sale of insurance policies; an override is not the same thing as a commission, and the word "override" doesn't appear in the contracts. And because the 1% override payments aren't commissions, they cannot be "vested renewal commissions" that are owed as long as policies are being renewed and even after DeWitte, Filley, and Meador no longer work for Financial Associates. The area-manager contracts don't

11

govern the override payments, so Financial Associates did not breach those contracts when it stopped making the payments.

DeWitte, Filley, and Meador also argue, in the alternative, that the area-manager contracts are ambiguous about whether the 1% override is a vested renewal commission and that to resolve that uncertainty, we should consider evidence other than the contract itself—specifically the fact that Financial Associates paid them the 1% override consistently for 20 years.

The question of whether a written legal document is ambiguous is a question of law subject to unlimited review—again, we owe no deference to the district court's conclusion. See *Waste Connections of Kansas*, 296 Kan. at 964.

We do not find that the area-manager contracts are ambiguous. They plainly cover commissions for direct sales of insurance policies and do not mention override fees. Stumpf claimed that there should have been a commission schedule showing the 1% override payments and that he assumed there was one, but no one can find that document now, and in the absence of such a document, these area-manager contracts simply don't govern the 1% override payments. Stumpf's statement isn't part of the contract, and we won't use it to create an ambiguity in an otherwise clear contract. Additionally, DeWitte, Filley, and Meador all testified that the override agreement wasn't in writing. The undisputed evidence shows that overrides and commissions are different and are governed by different contracts. Furthermore, while it's undisputed that Financial Associates paid the 1% override consistently for 20 years, this fact doesn't tend to show that such payments were *vested* like renewal commissions for direct sales—it just shows that that's how DeWitte, Filley, and Meador were paid when they worked for Financial Associates.

12

II. *The Statute of Frauds Bars DeWitte, Filley, and Meador from Enforcing the Oral Agreement About the 1% Override Payments.*

DeWitte, Filley, and Meador argue that even if the 1% override payments aren't required under the area-manager contracts, they had an oral agreement with Stumpf that Financial Associates would continue to pay the 1% override as a vested renewal commission. We note that this oral agreement doesn't modify the area-manager contracts, which plainly require modifications to be in writing. This oral agreement is at best a separate contract, and while no one disputes that it existed or that Financial Associates paid DeWitte, Filley, and Meador the 1% override while they still worked there, the question is whether the oral promise to continue paying the 1% override as a vested renewal commission is enforceable under the statute of frauds.

The statute of frauds requires certain types of contracts to be in writing for them to be enforceable—if the statute of frauds applies to a contract and it's not in writing, it can't be enforced. K.S.A. 33-106. Relevant to this case, contracts that cannot be performed within 1 year must be in writing to be enforceable. K.S.A. 33-106. Kansas courts have consistently understood this aspect of the statute of frauds to apply only when it is *impossible* to perform the contract within 1 year. See *Nutt v. Knutson*, 245 Kan. 162, 164, 795 P.2d 30 (1989); *In re Estate of Brecheisen*, No. 111,745, 2015 WL 3632335, at *3 (Kan. App. 2015) (unpublished opinion); Murray on Contracts § 72 (4th ed. 2001). The application of the statute of frauds is a matter of statutory interpretation that this court reviews without deference to the district court's conclusions. *Ayalla v. Southridge Presbyterian Church*, 37 Kan. App. 2d 312, 317, 152 P.3d 670 (2007).

So let's consider whether it would have been impossible to perform the oral override agreement within 1 year; if so, the statute of frauds prevents its enforcement. DeWitte, Filley, and Meador say that the 1% override is owed as a vested renewal commission under the terms of the oral agreement (even if it's not owed under the area-

13

manager contracts). According to the administrative-services agreement that governs the override payments from Blue Cross to Financial Associates, the override is a percentage of the premiums collected by Blue Cross on policies sold by Financial Associates agents. DeWitte, Filley, and Meador claim that they should continue receiving the 1% override payments (because they are *vested*) as long as policies obtained by the agents that they supervised continue to be renewed (because the agreement covers *renewal* commissions). But the renewal aspect of the oral agreement makes it impossible to perform the agreement in 1 year and thus triggers the requirement that the contract be in writing. Insurance policies are for 1-year terms, so they cannot be renewed in less than 1 year, and the renewal premiums—collected by Financial Associates agents, sent to Blue Cross, and used to calculate the override fee—couldn't have been collected in less than 1 year. It wouldn't be possible for Financial Associates to pay 1% of all renewal premiums on all the outstanding policies until more than a year from the date of the oral agreement because the policies are annual. See, *e.g.*, *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 535-36, 473 N.W.2d 652 (1991) (finding that employer's alleged promise to pay a 7% renewal commission "forever" was unenforceable under the statute of frauds because it couldn't have been performed in less than a year). Since the agreement can't be performed in less than 1 year, the statute of frauds applies, and because the agreement wasn't in writing, we can't enforce it.

DeWitte, Filley, and Meador argue that the oral agreement could have been performed in less than 1 year because circumstances could change within a year that would affect whether they would be paid the override. For example, they reference a provision from the area-manager contracts that states that if the amount of commission drops below $100 in a month, the commission payments will stop. This provision deals with commissions, not overrides, so it's not necessarily a term of the oral override agreement. But let's imagine that in the year following the oral override agreement, absolutely none of the Blue Cross policies sold by Financial Associates agents were renewed, and no renewal premiums were collected. According to DeWitte, Filley, and

14

Meador, the override works like regular commissions—if there are no renewal premiums, the agents aren't paid. Does this hypothetical situation amount to performing the oral agreement in less than 1 year? No. If no policies are renewed (or if the commissions owed drop below $100 in a month), that *excuses* Financial Associates' performance—it's not the same as if it had actually performed. See Restatement (Second) of Contracts § 130, comment b (1981) (distinguishing excuse from performance); *Rudinsky v. Harris*, 231 Ariz. 95, 100, 290 P.3d 1218 (Ct. App. 2012) (noting that a contract to pay commissions indefinitely into the future isn't completed and performed simply because there aren't any sales in a year and finding that the alleged contract could not be satisfied by an event or contingency that may occur within the year). Simply put, there's no way for Financial Associates to perform until policies are renewed, which cannot happen in less than 1 year. So the statute of frauds applies to the oral agreement, and we can't enforce it.

DeWitte, Filley, and Meador next argue that even if the statute of frauds applies to the oral agreement, they have fully performed under that agreement, so we should enforce the agreement anyway. Full performance is an exception to the statute of frauds in these circumstances: "When one party to a contract has completed his performance, the one-year provision of the [statute of frauds] does not prevent enforcement of the promises of other parties." Restatement (Second) of Contracts § 130 (1981); *In re Estate of Hargreaves*, 201 Kan. 57, 62, 439 P.2d 378 (1968). In other words, when one party fully performs under an oral contract and the only thing left to do under the contract is for the other party to pay, the statute of frauds doesn't bar enforcement. *Kinser v. Bennett*, 163 Kan. 725, 729, 186 P.2d 284 (1947).

Here, DeWitte, Filley, and Meador allege that they fully performed their responsibilities as area managers and were model employees while they worked at Financial Associates. That may be true. And they claim that because their right to the override payments was vested, they don't need to do anything further to receive payment.

15

But there is one other thing that needs to happen before Financial Associates pays the 1% override—policyholders must choose to renew their policies. Since policyholders are not required to do that, and because the override depends and is calculated based on renewals that aren't guaranteed, we cannot say that the *only* thing left to do under the alleged oral agreement is for Financial Associates to pay the override fee. See *Kinser*, 163 Kan. at 729. In other words, the right of DeWitte, Filley, and Meador to receive continued override payments is contingent on policyholders choosing to renew their policies.

There don't appear to be any Kansas cases that address whether a party has fully performed when the remainder of the contract is contingent on the actions of third parties. Turning to other states, we find *Lighthart v. Lindstrom*, 24 Ill. App. 3d 918, 322 N.E.2d 70 (1975), most similar to the facts of this case. There, the plaintiff alleged an oral agreement that he would be paid a commission for obtaining a 5-year lease and another commission for any renewal of that lease, regardless of whether he was the person who actually obtained the renewal. The plaintiff argued that even though the contract couldn't be performed in less than 1 year (because of the 5-year lease period), the statute of frauds didn't apply because he had fully performed—he claimed he was entitled to renewal commissions even if he did nothing to obtain the renewals. The Illinois court disagreed, finding that the full-performance exception didn't apply in this circumstance, where the plaintiff's right to a commission depended not on his own full performance but on the actions of a third party. 24 Ill. App. at 921-22. Courts in New York and Ohio have reached similar results. See, *e.g.*, *Gersten-Hillman Agency, Inc. v. Heyman*, 68 A.D.3d 1284, 1287, 892 N.Y.S.2d 209 (2009) (a service contract of indefinite duration in which one party procures customers for another party cannot be performed in 1 year because performance depends on a third party, not the will of the parties to the contract); *Daup v. Tower Cellular, Inc.*, 136 Ohio App. 3d 555, 565, 737 N.E.2d 128 (2000) ("[W]here a defendant's obligation to perform under an oral agreement is contingent upon the future acts of a third party and will continue for an indefinite period of time in the future, such contract falls within the Statute of Frauds.").

16

On the other hand, an Iowa case came to the opposite result: *Glass v. Minnesota Protective Life Ins. Co.*, 314 N.W.2d 393 (Iowa 1982). There, the plaintiff alleged an oral agreement that after he had worked for the defendant for 10 years, he would be entitled to vested renewal commissions for the rest of his life (and his spouse's life). The Iowa court assumed that the statute of frauds applied but found that the full-performance exception also applied, making the oral agreement enforceable. 314 N.W.2d at 396. The defendant argued that the plaintiff hadn't fully performed because the right to renewal commissions was contingent on policyholders actually renewing their policies and paying their premiums. The Iowa court disagreed with the defendant and held that "the doctrine of full performance by one party . . . is not conditioned upon performance by third parties." 314 N.W.2d at 396; see 4 Couch on Insurance 3d § 57:43 (2011) (citing *Glass*); accord *Fresh Capital Financial Services, Inc. v. Bridgeport Capital Services, Inc.*, 891 So. 2d 1142, 1145 (Fla. Dist. App. 2005) (doctrine of full performance by one party isn't conditioned on performance by third parties); *Am. Chocolates, Inc. v. Mascot Pecan Co.*, 592 So. 2d 93, 94 (Miss. 1991) (holding that plaintiff had fully performed contract entitling it to 5% commission on future sales to defendant when it secured customer for defendant); *Linn v. Employers Reinsurance Corp.*, 397 Pa. 153, 157-58, 153 A.2d 483 (1959) (indicating that plaintiff had fully performed a contract entitling it to commissions on reinsurance premiums when it aided the defendant in the "securing of the business").

DeWitte, Filley, and Meador argue that Kansas law follows the *Glass* case, citing a federal district court case: *The Superlative Group, Inc. v. WIHO, LLC*, No. 12-1468-JWL, 2014 WL 1385533 (D. Kan. 2014) (unpublished opinion). But there's a critical distinction between *The Superlative Group* case and ours: in it, the third party was contractually obligated to take the action necessary for the plaintiffs to receive the payments in question.

17

In *The Superlative Group*, the plaintiff orally agreed to lease suites in a hockey arena in exchange for a 20% commission on sales of suite tickets for hockey games for the next 5 years. The plaintiff leased some suites and included in the lease agreements a condition that the lessees *had to buy a certain number of suite tickets for hockey games each year for the next 5 years*. The defendant failed to pay the commission and claimed that the statute of frauds barred enforcing the agreement because the defendant couldn't complete its obligation to pay commissions for the next 5 years in less than 1 year. But the court found that the full-performance exception to the statute of frauds applied because the plaintiffs had fully performed under the agreement. 2014 WL 1385533, at *2. *The Superlative Group* is easily distinguished from our case—there, the suite lessees were obligated, as a condition of the lease agreement, to buy hockey tickets for the next 5 years. But here, the policyholders are under no obligation to renew their policies.

DeWitte, Filley, and Meador claim that they have fully performed under the contract, but unlike in *The Superlative Group*, the policy renewals, which result in premiums that determine the override payment, are not guaranteed. DeWitte, Filley, and Meador won't have anything to do with obtaining those renewals—whereas the plaintiffs in *The Superlative Group* had fully performed because there was nothing left to do except wait for the lessees to follow up on their own contractual obligation to buy hockey tickets. In other words, by putting the requirement to buy tickets for 5 years in the lease agreements, the plaintiffs in *The Superlative Group* secured their right to a commission on those tickets. Here, if DeWitte, Filley, and Meador continued working for Financial Associates and supporting the agents who were working to renew policies, they would be fully performing under the oral override agreement. But since they no longer work for Financial Associates, their so-called "vested" right to the override depends entirely on the will of the policyholders (and the work of Financial Associates agents to obtain renewals). Thus, *The Superlative Group* doesn't support applying the full-performance exception in this case, where Financial Associates' alleged obligation to pay the 1% override depends entirely on the actions of third-party policyholders.

18

Clearly, different states have reached different results on whether the full-performance exception can apply when third parties still must take some action to continue or complete the contract, and we lack any significant guidance from other Kansas courts. But we are reluctant to add exceptions to the statute of frauds since that statute represents a policy choice made by the legislature. See *Barbour v. Campbell*, 101 Kan. 616, Syl. ¶ 2, 168 P. 879 (1917). Adhering to the statute of frauds eliminates concerns about the reliability of oral evidence and fosters certainty in transactions. See *Ronald L. Jones Charitable Trust v. Sanders*, No. 106,690, 2012 WL 3966557, at *4 (Kan. App. 2012) (unpublished opinion). Accordingly, we will follow the New York and Illinois approach. We hold that when a party to an oral agreement has fully performed but the other party's obligation to pay remains contingent on the actions of independent third parties, the full-performance exception does not apply to take the oral agreement out of the statute of frauds. With regard to an agreement to pay hundreds of thousands of dollars a year to employees who no longer work for a company and are no longer involved in obtaining policy renewals either directly or in a managerial capacity, we think it is reasonable to require that such an arrangement be in writing to be enforceable.

DeWitte, Filly, and Meador also argue that applying the statute of frauds in this case would be unjust and inequitable. Kansas courts do recognize that the statute of frauds "yields to compelling equitable circumstances." *Bouton v. Byers*, 50 Kan. App. 2d 34, 58, 321 P.3d 780 (2014); see *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 59, 643 P.2d 100 (1982) (stating that the statute of frauds was designed to prevent fraud and injustice and shouldn't be used as a shield to protect fraud). But compelling equitable circumstances require more than just a breach of an oral contract because breaching a contract isn't inherently fraudulent. *Decatur Cooperative Association v. Urban*, 219 Kan. 171, 179, 547 P.2d 323 (1976) ("[T]he exercise of the right of nonperformance is no more a fraud than a breach of any other contract."). Stated differently, courts won't allow a defendant to use the statute of frauds to take advantage of his or her own wrong. *Texas*

19

*Co. v. Sloan*, 171 Kan. 182, 189, 231 P.2d 255 (1951). For example, Kansas courts have noted that if the party invoking the statute of frauds had made false representations, that could be a reason to enforce the contract. See *Cooper v. RE-MAX Wyandotte County Real Estate, Inc.*, 241 Kan. 281, 291-92, 294, 736 P.2d 900 (1987). Other courts have looked to whether the plaintiff's reliance on the contract was so great that injustice would result if the contract weren't enforced. *Walker v. Ireton*, 221 Kan. 314, 321-22, 559 P.2d 340 (1977). On questions of equity, we review the district court's decision for an abuse of discretion, asking (assuming no underlying factual or legal error) whether no reasonable person would take the view of the district court. *Fleetwood Enterprises v. Coleman Co.*, 37 Kan. App. 2d 850, 864, 161 P.3d 765 (2007); see *Wiles v. American Family Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

Here, the district court didn't abuse its discretion when it determined that no injustice would result from rejecting DeWitte, Filley, and Meador's claim to continued 1% override payments. DeWitte, Filley, and Meador haven't claimed that Financial Associates made any false representations or acted fraudulently. They simply claim that by the terms of the oral agreement, Financial Associates agreed to continue paying them the 1% override even after they stopped working there and that Financial Associates has breached that oral agreement. DeWitte, Filley, and Meador do allege that they relied on those continued payments as part of their retirement incomes, but the district court didn't abuse its discretion when it determined that that reliance wasn't sufficient to overcome the statute of frauds. Financial Associates paid DeWitte, Filley, and Meador the 1% override while they worked there, but as the district court found, they now seek compensation for renewals of "policies they did not secure themselves and on which they provide no support." Not requiring Financial Associates to continue paying DeWitte, Filley, and Meador isn't inequitable in these circumstances and doesn't amount to the "sanctioning of fraud or other injustice." *Bittel v. Farm Credit Svcs. of Central Kansas, P.C.A.*, 265 Kan. 651, 663, 962 P.2d 491 (1998).

Because the override agreement falls within the statute of frauds and there is no written contract showing that Financial Associates would pay the 1% override as a vested renewal commission, DeWitte, Filley, and Meador can't enforce the oral override agreement.

III. *The Covenant of Good Faith and Fair Dealing Doesn't Attach to an Unenforceable Contract.*

Last, DeWitte, Filley, and Meador argue that the district court erred when it denied their claim that Financial Associates breached the duty of good faith and fair dealing.

The duty of good faith and fair dealing is implied in every Kansas contract except employment-at-will contracts. *First Nat'l Bank of Omaha v. Centennial Park*, 48 Kan. App. 2d 714, 729, 303 P.3d 705 (2013) (citing *Estate of Draper v. Bank of America*, 288 Kan. 510, Syl. ¶ 13, 205 P.3d 698 [2009]). It's a promise that neither party to the contract will do anything to keep the other party from carrying out his or her part of the agreement or do anything that will destroy or injure the right of the other party to receive the fruits of the contract. 48 Kan. App. 2d at 729. There were two alleged contracts in this case— we will examine whether Financial Associates breached its duty of good faith in either one.

First, Financial Associates didn't breach the duty of good faith and fair dealing in the oral agreement because that agreement isn't enforceable. The duty of good faith is *implied in Kansas contracts*, and here, no contract existed in which to imply the duty. See 48 Kan. App. 2d at 729; 17A Am. Jur. 2d, Contracts § 362 ("[T]he duty of good faith and fair dealing is not 'free-floating' but exists only in relation to performance of a specific contract term.").

21

Second, in Kansas, the duty of good faith and fair dealing doesn't apply to employment-at-will contracts, since "employment at will" means that either party can end the employment for any reason, even in bad faith. 48 Kan. App. 2d at 729; *St. Catherine Hospital of Garden City v. Rodriguez*, 25 Kan. App. 2d 763, 765-66, 971 P.2d 754 (1998).

Both parties and the district court focused intensely on whether every part of an employment-at-will contract is exempted from the duty of good faith or whether only the employer's ability to terminate an employee is exempted. DeWitte, Filley, and Meador argue that only the termination of such contracts is exempt and that the duty of good faith does apply to other provisions, such as compensation. (They don't seem to dispute the district court's finding that they were at-will employees under the area-manager contracts.) The district court disagreed with the distinction that DeWitte, Filley, and Meador tried to make and held that the area-manager contracts were employment-at-will contracts, to which the duty of good faith and fair dealing did not apply. See *Morriss v. Coleman Co.*, 241 Kan. 501, 518, 738 P.2d 841 (1987) (holding plainly that the duty of good faith and fair dealing doesn't apply to employment-at-will contracts).

But we don't need to decide whether the duty of good faith applies to every aspect of an employment-at-will contract or only to the portions actually related to being employed. We find it more telling that Financial Associates hasn't actually breached the area-manager contracts—DeWitte, Filley, and Meador are all still being paid the vested renewal commissions for the policies that they sold themselves under the terms of the area-manager contracts and the Blue Cross commission schedules. And that's the only compensation that the area-manager contracts provide for—as we've explained, they don't apply to the 1% override. So Financial Associates is performing its obligations under the area-manager contracts in good faith. All DeWitte, Filley, and Meador claim is that Financial Associates stopped paying them the 1% override after they stopped working there—a claim that doesn't have anything to do with the area-manager contracts in which

22

they aim to insert a duty of good faith. DeWitte, Filley, and Meador haven't alleged that Financial Associates has done anything to keep them from carrying out their part of the agreement. According to them, they don't have to do anything to be entitled to the 1% override. Their only allegation is that by not paying them the 1% override, Financial Associates has destroyed their right to receive the fruits of the contract. But the 1% override isn't the fruit of *this* contract. It was the fruit of the unenforceable oral agreement.

We affirm the district court's judgment.