NOT DESIGNATED FOR PUBLICATION

No. 118,456

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STECKLINE COMMUNICATIONS, INC.,
*Appellant*,

v.

JOURNAL BROADCAST GROUP OF KANSAS, INC.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DEBORAH HERNANDEZ MITCHELL, judge. Opinion filed October 5, 2018. Reversed and remanded with directions.

*William P. Tretbar* and *Adam R. Burrus*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellant.

*Jay F. Fowler* and *Amy S. Lemley*, of Foulston Siefkin LLP, of Wichita, for appellee.

Before GREEN, P.J., PIERRON and BUSER, JJ.

PER CURIAM: This is a summary judgment case involving a contract dispute between two companies in the radio broadcasting industry: the plaintiff, Steckline Communications, Inc. (SCI), and the defendant, Journal Broadcast Group of Kansas, Inc. (JBGK). In 2003, SCI's predecessor-in-interest, Mid-America Ag Network, Inc. (MAAN, Inc.) entered into a written agreement with JBGK to settle prior litigation. Under the agreement, MAAN, Inc. agreed to provide programming for broadcast over a radio station owned by JBGK for a period of 15 years. JBGK agreed to broadcast the

1

programming, as well as the advertising sold by MAAN, Inc. for air during the broadcasts.

In 2005, the written settlement agreement was assigned by MAAN, Inc. to SCI, and SCI began furnishing content to JBGK under the agreement. In June 2012, JBGK stopped broadcasting the programming and advertising which SCI had by then been providing for seven years. SCI sued JBGK for breach of the 2003 agreement.

JBGK moved to dismiss SCI's action, asserting that SCI lacked standing because JBGK never consented to the assignment of MAAN, Inc.'s rights. In March 2014, the trial court granted JBGK's motion to dismiss. The trial court based its dismissal of SCI's action on the failure of MAAN, Inc. to obtain JBGK's consent to the assignment of the agreement as required by its terms. The trial court's decision was affirmed by this court but eventually reversed by our Supreme Court in *Steckline Communications, Inc. v. Journal Broadcast Group of Kansas, Inc.*, 305 Kan. 761, 388 P.3d 84 (2017). Our Supreme Court held that SCI had pled facts which, if proven, were sufficient to establish that JBGK was equitably estopped to contest SCI's standing to bring this action. Thus, it remanded this case for further proceedings.

On remand, JBGK moved for summary judgment. The trial court granted JBGK's motion and held that SCI had failed to prove the elements of an equitable estoppel claim. In making its decision, the trial court concluded that SCI's evidence offered to prove that JBGK "knew or should have known" about the assignment was "ambiguous" and, therefore, SCI had failed to properly establish a claim of equitable estoppel.

On appeal, SCI asserts that this case was not ripe for summary judgment and that the issue of whether JBGK knew or should have known of the assignment to SCI should have been decided at trial. JBGK responds by asserting that SCI failed to establish the

elements of equitable estoppel and that the trial court was the proper entity to decide whether SCI had standing to assert a claim for equitable estoppel.

Because there is a disputed issue of material fact and the trial court failed to weigh the evidence in favor of SCI, the nonmoving party, we reverse and remand for trial.

*Factual Background*

In 1977, Larry Steckline formed Mid America Ag Network (MAAN) and later created Mid America Ag Network, Inc. (MAAN, Inc.) with the goal of producing market reports and other radio programming for those in the agricultural community. MAAN, Inc.'s principle asset was MAAN.

In 1992, MAAN, Inc.'s board of directors elected Larry's son, Greg Steckline, to replace an existing board member. At that time, the board also appointed Greg to serve as MAAN, Inc.'s vice-president. Greg served as MAAN, Inc.'s vice president and as a minority stockholder until 2005.

In 2003, MAAN and JBGK settled a lawsuit. Larry, as the president of MAAN, and Douglas G. Kiel, vice chairman of JBGK, executed the settlement agreement on behalf of the parties. SCI was not a party to the settlement agreement. The term of the agreement was 15 years; beginning June 9, 2003, and lasting until June 9, 2018. The agreement provided, "[e]ffective August 1, 2003, this 2003 [a]greement will represent the sole and entire agreement of the parties related to any radio station or other asset of JBGK and its affiliates or to MAAN and its affiliates." Paragraph 14 of the agreement stated:

> "**Binding Effect; Assignment.** This 2003 Agreement shall be binding upon and inure to
> the benefit of the successors, heirs and assigns of each party, provided, however, that

MAAN shall not assign this 2003 Agreement, or any interest therein, to any Wichita radio broadcast competitor of JBGK, without the prior written consent of Douglas G. Kiel or Stephen J. Smith (or their respective successors), which consent may be withheld by them in their sole discretion; and . . . neither party shall assign this 2003 Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld."

Paragraph 16 of the agreement stated: "**Amendment.** This Agreement shall only be amended or altered through a written agreement signed by an authorized officer of each party. No future course of conduct shall be interpreted to amend or modify the express terms of this 2003 Agreement."

Under the agreement, MAAN agreed to provide programming and content to JBGK for broadcasting on KDFI-FM and KFTI-AM (now known as KLIO-AM). MAAN was entitled to the revenue from the advertising sold during the programming it provided to JBGK. With respect to the content furnished by MAAN, paragraph 4 of the agreement provided:

"**Compliance with Federal Communications Commission Requirements.** MAAN shall ensure that the programming and commercials it provides . . . complies in all respects with the Communications Act of 1934, as amended; all rules, regulations and policies of the FCC (collectively, the 'FCC Requirements'); and all standards of acceptance imposed by JBGK uniformly on providers of content or advertisements. If JBGK determines, in its reasonable discretion, that MAAN's programming or commercials do not comply with any of the FCC Requirements or JBGK's standards of acceptance, JBGK shall notify MAAN of its determination. MAAN must promptly and completely correct such issues. MAAN agrees that it shall not promote in its content or advertisements any . . . information or content which is indecent or offensive under contemporary community standards."

4

Additionally, paragraph 5B stated: "Each program and commercial unit [provided by MAAN] shall have an audio quality and fidelity at least as good as other programs broadcast by JBGK."

SCI acquired the right to operate MAAN in 2005. At that time, Greg owned and operated SCI. Neither Greg nor SCI owned MAAN, Inc. A document produced by SCI during discovery titled, "Joint Action of Directors and Stockholders by Written Consent in Lieu of Special Meeting," provided that MAAN would "assign all of the rights, property and obligations described on Exhibit A" to a "New Corporation in exchange for all of the issued and outstanding shares of capital stock" in MAAN. MAAN authorized the "New Corporation" to be formed "under the name Steckline Broadcasting, Inc., or under such other name as Gregory Steckline may determine." Exhibit A authorized the assignment of "Business/Advertiser Contract, Contacts, Etc.," as well as "Affiliate Contracts." MAAN never formally informed JBGK of any assignment of rights by MAAN to SCI while JBGK continued to perform under the 2003 settlement agreement between MAAN and JBGK. Still, SCI maintained that JBGK was aware of the assignment by other means.

After the sale of the MAAN, Inc. assets, Greg asked Larry several times to contact Kiel to help resolve issues that had arisen between KFDI/KFTI and Greg's operating entity. In discussing the particular issues with Kiel, Larry always made clear that he was calling on behalf of Greg, whose company then owned MAAN. Kiel would generally give Larry the name of a JBGK employee that Greg should contact. Larry would then relay the contact information to Greg. Often that contact was Eric McCart, because McCart was the sales manager and, later, the general manager of the KFDI/KFTI stations owned by JBGK.

McCart once contacted Greg asking whether Greg, as owner of the sports radio station KGSO, was going to broadcast all the Kansas State games on that station. Greg

5

declined, explaining that he could not do so because JBGK had the exclusive contractual right under the 2003 settlement agreement to broadcast that programming over its air for 15 years.

In November 2009, SCI purchased a Wichita radio station known as KQAM-AM 1480. KQAM-AM was an affiliate of MAAN. News stories reporting the transaction were published by the Wichita Eagle and the Wichita Business Journal on November 16, 2009. The headline of the story published by the Wichita Eagle read: "Steckline buys KQAM 1480." The article referred to SCI and Greg Steckline and MAAN, but did not refer to Larry. The headline of the article published by the Wichita Business JBGK read: "Steckline buys Disney Radio Station." Again, the article did not refer to Larry but did refer to SCI, Greg, and MAAN. The trial court, however, stated that the articles did not mention MAAN but the articles do refer to "Mid America chain of networks" and "Mid America Ag News."

In 2010, Larry changed the name of MAAN, Inc. to LS Media, Inc., in part because of the confusion that had arisen from MAAN separating from MAAN, Inc. after the asset sale to SCI.

SCI often communicated with representatives of JBGK by e-mail correspondence. From 2005, when he bought MAAN and the Kansas State inventory, until 2012, Greg frequently e-mailed employees of JBGK at KFDI/KFTI. The e-mails sent by Greg have an automatic signature block with information that he is the president of SCI. The signature block also contains the MAAN logo, along with logos of four other radio stations owned by SCI.

Even after SCI acquired the right to operate MAAN in 2005, the source of programming provided to KLIO was still identified as MAAN until 2012. Then, an incident occurred on June 29, 2012, in which inappropriate language was broadcast

during the time slot provided for MAAN. The parties continue to dispute the unresolved facts of who was responsible for the incident and whether there were other prior ongoing problems between the parties. Following the incident, JBGK stopped broadcasting programming pursuant to the agreement.

Other allegedly problematic content in MAAN's programming (provided by SCI) began in mid-2011 and lasted through June 29, 2012. JBGK documented more than 43 times when the quality of MAAN's content resulted in broadcasted periods of "dead air." During depositions, Greg stated that JBGK "had . . . months and months and months of opportunities to cancel this [contract] due to breach of contract."

On July 10, 2012, JBGK's senior vice president sent a letter to MAAN addressed to Greg requesting that MAAN explain the June 29 problematic broadcast. The letter also gave notice that the problematic broadcast constituted a breach of the 2003 settlement agreement. Next, on August 2, 2012, following the completion of the respective internal investigations, JBGK sent another letter to MAAN addressed to Kent A. Meyerhoff, one of the attorneys who represented MAAN when it entered into the 2003 settlement agreement. This letter notified MAAN that the problematic broadcast constituted an incurable breach of the 2003 settlement agreement and that JBGK was terminating the agreement. Beginning June 29, 2012, JBGK stopped broadcasting content and advertisements provided by MAAN.

On December 5, 2012, SCI, referring to itself as MAAN's "predecessor-in-interest," sued JBGK to recover damages stemming from JBGK's termination of the settlement agreement. JBGK answered SCI's complaint and asserted a counterclaim against SCI seeking an order from the court requiring SCI to indemnify JBGK for any damages or costs, including attorney fees, it might incur as a result of the June 29 problematic broadcast. SCI answered JBGK's counterclaim, denying responsibility for

7

any act of omission creating an obligation to indemnify JBGK and stating that no statutory or contractual authority existed for JBGK's demand for attorney fees.

Following the close of discovery and after the parties had submitted an agreed pretrial order, SCI moved for partial summary judgment on the liability portion of its claim against JBGK and on JBGK's counterclaim against SCI. In its supporting memorandum, SCI argued it was entitled to judgment as a matter of law because JBGK breached the settlement agreement when it unilaterally determined that the June 29 problematic broadcast was an incurable breach and terminated the settlement agreement without providing SCI an adequate period of time to cure any shortcomings in its performance. SCI also argued it was entitled to judgment as a matter of law against JBGK's claim for attorney fees because paragraph 12 of the settlement agreement did not apply to SCI's breach of contract claims against JBGK.

On January 21, 2014, JBGK responded to SCI's motion for summary judgment, arguing the problematic broadcast was not correctable and that it had given SCI adequate notice and opportunities to correct any deficiencies in its content over the year preceding JBGK's termination of the settlement agreement. JBGK raised the defense that SCI was not entitled to enforce the settlement agreement because MAAN did not seek JBGK's consent before MAAN assigned the agreement to SCI in 2005. Finally, JBGK defended its attorney fees claim on the basis that the broad language of paragraph 12 of the settlement agreement presented a question of fact.

The trial court held a hearing on SCI's motion for summary judgment in January 2014. The trial court denied SCI's motion on the issue of breach of the settlement agreement and granted SCI's motion on the issue of attorney fees. In doing so, the trial court held that SCI lacked standing to sue.

JBGK then moved to dismiss under K.S.A. 60-212(b)(6). The trial court held a hearing on the matter. Following oral argument, the court dismissed SCI's claim for lack of standing. The trial court also dismissed the remainder of JBGK's counterclaim for indemnification. As a result, all remaining claims asserted by SCI and JBGK were extinguished. SCI appealed.

This court concluded that SCI had failed to show that MAAN's assignment of rights was valid. *Steckline Communications, Inc. v. Journal Broadcast Group of Kansas, Inc.*, No. 111,651, 2015 WL 4366489, at *5-6 (Kan. App. 2015) (unpublished opinion), *rev'd* 305 Kan. 761, 388 P.3d 84 (2017). Thus, this court held that SCI lacked standing to sue under the settlement agreement. SCI filed a petition for review before our Supreme Court, which was granted.

In holding that SCI had established standing through a claim of equitable estoppel, our Supreme Court stated the following:

> "SCI asserted well-pled facts that JBGK, by its silence at the time of the assignment, induced SCI into believing that it had consented to the assignment of the agreement; that JBGK received several years of service from SCI pursuant to the terms of the agreement; that SCI rightfully relied on that course of conduct; and that SCI would be prejudiced or harmed by permitting JBGK to void the agreement by objecting to the assignment 7 years later.
>
> "Viewing the well-pled facts in a light most favorable to SCI, and resolving any factual disputes in SCI's favor, we find that SCI has sufficiently pled standing via equitable estoppel. In other words, if SCI can continue to prove the factual basis of its estoppel claim, JBGK will be prevented from asserting its contractual right to consent in writing to the assignment of the contract. Without the requirement of written consent from JBGK, there is nothing before us today demonstrating that the assignment from MAAN, Inc. to SCI was ineffective, and SCI has standing to assert claims for breach of the contract." 305 Kan. at 771.

9

On remand, JBGK moved for summary judgment. SCI responded to JBGK's motion and also moved for partial summary judgment in relation to JBGK's defense based on lack of standing. JBGK also filed a reply in support of its motion for summary judgment.

The parties agree, with few exceptions, that the trial court adopted the correct uncontroverted and controverted facts from the parties' filings. The trial court found as follows:

"1. The facts alleged in the Statement of Uncontroverted Facts in Defendant's Memorandum in Support of Summary Judgment in paragraphs 15, 20, 26, 29, 31, 32, 43[,] 51, 52, 53, and 54 are controverted.

"2. The facts alleged in the Statement of Uncontroverted Facts in Defendant's Memorandum in Support of Summary Judgment in paragraphs 1-14, 16, 17, 18, 19, 21, 22, 23, 25, 27, 30, 33-42, 44, 45, 46, 47, 49, 50, 55, 56, 57, 58, and 59 are uncontroverted.

"3. With respect to the facts alleged in paragraph 48 of the Statement of Uncontroverted Facts in Defendant's Memorandum in Support of Summary Judgment, the Court finds that there is no support provided for either contention and the statement will be disregarded for purposes of this motion.

"4. The facts alleged in the Statement of Uncontroverted Facts in Plaintiffs Response to Motion for Summary Judgment in paragraphs, 64, 76, 78, 86, 90 and 93 are controverted.

"5. The facts alleged in the Statement of Uncontroverted Facts in Plaintiffs Response to Motion for Summary Judgment in paragraphs 60, 61, 62, 65, 66, 68, 69, 70, 71, 75, 77,79, 80, 81, 82 (which appears twice) 84, 85, 87, 89, 91 and 92 are uncontroverted.

"7. With respect to the facts alleged in paragraph 63 of the Plaintiffs Statement of Additional Uncontroverted Facts the court finds it is uncontroverted the parties communicated by email."

The uncontroverted facts adopted by the trial court come from two documents. Paragraphs 1 through 59 are listed in JBGK's motion for summary judgment. Paragraphs

10

60 through 92 are listed in SCI's cross-motion for summary judgment. The uncontroverted facts adopted by the trial court are listed as follows:

"1. 'This case is traceable to prior litigation in this District and the settlement agreement that resolved it.' In 1998 the radio station involved in this case, call sign KLIO-AM or KLIO (then KFDI-AM) was owned by JBGK's predecessor in interest, which entered into an affiliation agreement with Mid America Ag Network, Inc.

"2. Pursuant to the 1998 affiliation agreement, Mid America Ag Network, Inc. (MAAN) furnished KLIO with agricultural market reports and other Mid America Ag Network-produced programming for broadcast. MAAN did not charge the stations a fee for providing the programming. Instead, JBGK's predecessor in interests (which for simplicity's sake will be referred to as JBGK) agreed to broadcast advertising that MAAN sold direct to advertisers for broadcast along with the Mid America Ag Network programming. MAAN retained 100% of the proceeds generated from its ad sales.

"3. In 2002, 'MAAN [was] a company engaged in the business of producing and broadcasting news, sports and weather programs for radio and television stations.'

"4. Disputes between JBGK and MAAN arose.

"5. Under the express language of the 1998 Affiliation Agreement, unless the parties mutually agreed to terminate the contract, there was no date of termination.

"6. One of MAAN's two stockholders (the other being Greg Steckline), and its President in 2002, Lawrence (Larry) Steckline (Greg Steckline's father), testified that in his view, the 1998 Affiliation Agreement was intended to continue into perpetuity and that JBGK could not get out of its obligations under the 1998 Affiliation Agreement unless he 'agreed to let them out.'

"7. JBGK took the position that the [1998 Affiliation Agreement] was not enforceable, and in 2002 it removed MAAN programming and advertising spots from its broadcasts.

"8. As a result of JBGK's actions, in 2002, MAAN commenced a civil action, *Mid America Ag Network, Inc. v. Journal Broadcast Group of Kansas, Inc*., District Court of Sedgwick County Case No. 02 C 1528, against JBGK, and JBGK asserted a counterclaim against MAAN in the same proceeding.

"9. At issue in the 2002 litigation, on which JBGK filed a motion for partial summary judgment, was whether the 1998 affiliation agreement was for an indefinite

11

term of duration that would continue in perpetuity and was, therefore, terminable at will under Kansas law.

"10. JBGK's motion for partial summary judgment in the 2002 litigation was denied.

"11. Thereafter, in June of 2003, JBGK settled with MAAN and the terms of that settlement were memorialized in the 2003 Settlement Agreement. The parties to the 2003 Settlement Agreement were JBGK and 'Mid America Ag Network, Inc., a Kansas corporation including all of its related and affiliated persons and entities (including, but not limited to, Mid America News Network) (collectively "MAAN").'

"12. The parties entered into the 2003 Settlement Agreement because they wished to enter into a full settlement of the 2002 litigation, and they filed a Journal Entry of Dismissal with prejudice and executed mutual releases.

"13. Steckline Communications, Inc. was not a party to the 2003 Settlement Agreement, and it was not entitled any [*sic*] benefit from the settlement agreement.

"14. Pursuant to the 2003 Settlement Agreement, MAAN—defined in the agreement to include 'all of its related and affiliated persons and entities' as of 2003—agreed to provide programming and advertising to be broadcast at very specific times over two of JBGK's radio stations, including KLIO's call sign predecessor, KFTI-AM (formerly known as call sign KFDI-AM).

. . . .

"16. Pursuant to the 2003 Settlement Agreement, MAAN was entitled to all revenue resulting from its sale of advertising for broadcast in conjunction with its programming.

"17. MAAN was not required by any provisions of the 2003 Settlement Agreement to purchase or pay for the commercial time it was given under the terms of the 2003 Settlement Agreement.

"18. '[R]adio stations make money from the sale of advertising.'

"19. JBGK was also obligated by the 2003 Settlement Agreement to make cash payments to Mid America Ag Network, Inc. for four years after the 2003 Settlement Agreement was executed. It was obliged to pay a so-called 'rights fee' for the MAAN programming, 'with $33,750.00 payable in each of the first four calendar years of this 2003 agreement by January 31 of each year beginning in 2004. Upon payment of the fourth payment in 2008, JBGK shall have a fully-paid-up license for such programming for the remainder of the term.'

12

. . . .

"21. With regard to Mid America Ag Network, Inc.'s ability to assign the 2003 Settlement Agreement, or rights thereunder, the 2003 Settlement Agreement provided:

"'This 2003 Agreement shall be binding upon and inure to the benefit of the successors, heirs and assigns of each party, provided, however that MAAN shall not assign this 2003 Agreement, or any interest therein, to any Wichita radio broadcast competitor of JBGK, without the prior written consent of Douglas G. Kiel or Steven J. Smith (or their respective successors), which consent may be withheld by them in their sole discretion; and . . . neither party shall assign this 2003 Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.'

"22. Steckline Communications, Inc. (SCI) is a competitor to JBGK. During the relevant time, it operated two radio stations in the Wichita market, KGSO and KQAM, which compete for advertising and advertising revenue with JBGK.

"23. The benefits JBGK received from the 2003 Settlement Agreement were the dismissal of the 2002 lawsuit and the substitution of the 2003 Agreement for the terms and conditions in the 1998 'perpetual contract.' ('Whereas, the parties are currently in litigation . . . and Whereas, the parties wish to enter into a full settlement of the litigation and clearly define the terms for a new relationship under which they will work together in the future.').

. . . .

"25. JBGK did not receive any of the revenue for the sale of ads accompanying the MAAN programming, or for the sale of air time to MAAN, pursuant to the terms of the 2003 Settlement Agreement.

. . . .

"27. In fact, SCI's control over the times specified in the 2003 Agreement detrimentally impacted the value of KLIO both from a programming standpoint and from the standpoint of JBGK's ability to compete with MAAN or SCI for advertising revenues.

. . . .

"30. Greg Steckline operates Mid America Ag Network.

. . . .

13

"33. In the pretrial order, plaintiff admitted that Steckline Communications, Inc. (SCI) now owns and operates the business known by the trade name Mid America Ag Network.

"34. Greg Steckline owns SCI.

"35. Greg Steckline, testifying as a corporate representative (a K.S.A. 60-230(b)(6) witness) for SCI testified that Mid America Ag Network is a d/b/a of SCI.

"36. Neither Greg Steckline nor SCI owns Mid America Ag Network, *Inc.*, which still exists; however, its name has been changed to LS Media.

"37. On air, the source of the programming provided to KLIO from 2003-2012 continued to be identified as 'Mid America Ag Network.'

"38. 'Mid America Ag Network, Inc. did not seek or obtain [JBGK's] approval prior to assigning the settlement agreement to SCI's predecessor.'

"39. MAAN was obligated under the 2003 Settlement Agreement to provide programs and commercials with an audio quality and fidelity at least as good as other programs broadcast by JBGK, and to deliver those programs and commercials to JBGK via satellite or ISDN facilities.

"40. MAAN was obligated under the 2003 Settlement Agreement to provide programs and commercials which complied in all respects with the Communications Act of 1934, as amended; all rules, regulations and policies of the FCC; and all standards of acceptance uniformly imposed by JBGK on its content providers.

"41. MAAN was also obligated under the 2003 Settlement Agreement not to promote in its content or advertisements any content which is indecent or offensive *under contemporary community standards*.

"42. After notification by JBGK that it determined that MAAN's programming or advertising did not comply with JBGK's acceptance standards, MAAN was obligated under the 2003 Settlement Agreement to 'promptly and completely' correct any noncompliance.

. . . .

"44. The requirement that MAAN shall not promote in its content or advertisements illegal gambling or lotteries, tobacco products, or information or content which is indecent or offensive under *contemporary community standards* is set out in a separate sentence of ¶ 4 of the 2003 Settlement Agreement. That sentence comes *after* the sentence in the contract that requires MAAN to promptly and completely correct any

14

issue concerning content which does not comply with any of the FCC Requirements, or with JBGK's uniformly imposed standards of acceptance.

"45. When Greg Steckline was asked about the repeated instances of MAAN's failure to deliver programming with adequate audio quality and fidelity to JBGK before June 29, 2012, he testified as follows:

"Q.     [Fowler, attorney for JBGK] Let's talk about some of the issues that you were having. By the way, have you reviewed the e-mail communications from Journal Broadcasting regarding the performance issue?

"A.     [Greg Steckline, pursuant to K.S.A. 230(b)(6)] Yes.

"Q.     When did you do that?

"A.     **Over the weekend.**

"Q.     And I take it you saw that there were repeated instances of failure to deliver signal, correct?

"A.     **Most of that was on Mid America Ag Network.**

"Q.     Well, your ability to have access to KLIO was a result of an agreement that related to the Mid America Ag Network, correct?

"A.     **Yes.**

"Q.     In fact, that's who the agreement was with, Mid America Ag Network, [c]orrect?

"A.     **Yes.**

"46. SCI stated in the pretrial order that **'The Mid America Ag Network** produces and distributes news and information programming and market reports, for broadcast.'

"47. In the pretrial order, SCI also stated: 'The radio programming Mid America Ag Network produces and distributes consists primarily of news and information of interest to listeners involved in agriculture and agribusiness, including farmers, ranchers and businesses that provide goods and services to farmers and ranchers. It also produces and distributes daily market reports as well as general news and sports programming.'

. . . .

"49. When asked about quality failures with the 2-minute Mid Ag report content furnished to KLIO, Steckline defined the Mid Ag report as: 'Programming provided by the Mid America Ag Network.'

15

"50. After this case was filed, SCI produced a document titled 'Joint Action of Directors and Stockholders by Written Consent in Lieu of Special Meeting Mid-America Ag Network, Inc.,' dated August 4, 2005, which is attached as Exhibit G.

. . . .

"55. The duration of JBGK's obligation to broadcast Mid America Ag Network's programming and advertising, pursuant to the 2003 Settlement Agreement was through June 9, 2018.

"56. There were more than 43 instances between mid-2011 and June 29, 2012 in which JBGK gave MAAN notice of quality and fidelity failures in the content delivered to JBGK's station, KLIO, by Mid America Ag Network.

"57. Many of these 43+ instances were 'dead air' failures.

"58. In the radio industry, even one instance of a failure to deliver programming that results in 'dead air' is too many:

"Q.     [Fowler] How many times is it acceptable not to broadcast, initiate a 6:30 program on time?

"A.     **[Steckline] how many times?**

        Mr. Tretbar: Object to form.

"A.     **Do what?**

"Q.     [Fowler] Yeah, how many times is acceptable?

"A.     **One.**

"Q.     How many times, at least up until Exhibit 42 in the year—less than a year, had you, Mid America Network/Steckline Communications, failed to deliver that program at 6:30?

"A.     **Well, I'm finding out there's more than I anticipated or knew of.**

"Q.     Quite a few more, apparently?

"A.     **Yes.**

. . . .

"Q.     How many times did you tell me earlier in the deposition was too many for the failure to deliver a program?

"A.     **Say what?**

"Q.     How many times did you tell me earlier in the deposition—

        Mr. Tretbar: I think he said once, counsel. And you know that he did.

"A.     **Yes.**

16

"Q.     [Fowler] One time is too many?

"A.     **Absolutely.**

"Q.     So this is another of those ones, Exhibit 53?

"A.     **Are you being a smart ass?**

"Q.     I'm just trying to ask questions, sir.

        Mr. Tretbar: Well, then ask a new question.

"Q.     [Fowler] how many times are we—

"A.     **One.**

"Q.     —up to?

        All right. One time is too many, correct?

"A.     **Correct.**

"Q.     All right. How many times are we up to?

"A.     **I have no idea.**

"59. Greg Steckline stated: 'They [JBGK] had, from the looks of it, months and months and months of opportunities to cancel this [contract] due to breach of contract.'"

"60. In November of 2009, SCI purchased a Wichita radio station known as KQAM-AM 1480. News stories reporting the transaction were published by the Wichita Eagle and the Wichita Business Journal on November 16, 2009.

"61. The Wichita Eagle story, published under the headline 'Steckline buys KQAM 1480,' does not refer to Larry Steckline or Mid America Ag Network, Inc. It states in part:

"Steckline Communications has purchased KQAM AM 1480 radio in Wichita from Radio Disney.

"The station . . . will move to the KGSO studios at Maize and Kellogg, owner Greg Steckline said in a news release. The station will carry news, talk, sports and business as the flagship of Steckline's Mid America Ag, news and sports networks . . . .

"Steckline owns radio stations in Garden City, Scott City and Guymon, Okla., along with the Mid America chain of networks which provides programming to 37 stations in Kansas, Oklahoma and Nebraska."'

"62. The Wichita Business Journal story, published under the headline 'Steckline buys Disney Radio station,' does not refer to Larry Steckline or Mid America Ag Network, Inc. It states in part:

17

"Steckline Communications Inc. has purchased AM 1480 KQAM radio in Wichita. . . .

"Greg Steckline, president of Steckline Communications, says the company wasn't aggressively looking for new stations. . . .

"Steckline Communications also owns KIUL AM and KGGS AM CP in Garden City, KYUL AM in Scott City and KGYN in Guymon, Okla.

"It also has the Mid America Ag, News and Sports Networks, which provides programming to 37 radio stations in Kansas, Oklahoma and Nebraska."

"63. SCI often communicated with representatives of Journal by means of email correspondence.

. . . .

"65. In May of 2010, Journal voluntarily changed the format of the programming broadcast over KLIO-AM 1070 from 'classic country' to 'oldies.'

"66. As early as 2011, Journal began to consider the possibility of changing the format yet again, to broadcast the programming of ESPN Deportes, which provides Spanish-language sports programming to a network of affiliate broadcasters. It eventually made this switch at some point after the broadcast of the 'Grammar Lesson' audio over its air in June, 2012.

. . . .

"68. Journal's former general manager acknowledged that programming is essential in broadcasting, and that it would be 'catastrophic' for a radio station to go without programming.

"69. Larry Steckline incorporated Mid America Ag Network, Inc., ('MAAN, Inc.'), in 1978, in part, to 'conduct and operate a radio and television agricultural reporting network; to broadcast, disseminate, distribute, transmit, retransmit, receive, or collect by electronic, electrical, or other means, farm and agricultural news and markets, commodities, grain and livestock reports and agricultural forecasts. . . .' This reporting network was called the Mid America Ag Network ('MAAN').

"70. To acknowledge the contribution of Greg Steckline to the business, in 1992 the MANN, Inc., Board of Directors elected Greg to replace an existing board member. At that time, Greg was also appointed to serve as Vice-President.

"71. From 1992 until 2005, Greg Steckline was the Vice-President of MAAN, Inc., and a minority shareholder.

18

"72. The principle asset of MAAN, Inc., was MAAN. MAAN was a contract-based affiliation and relationship between MAAN, Inc., and various radio stations throughout Kansas, Oklahoma, Nebraska and Colorado that broadcast the MAAN's agricultural-business reports. Another asset of MAAN, Inc., was the exclusive contractual right to broadcast Kansas State University sports programming, which was carried by multiple radio stations. The source of the programming was identified as the Mid America Sports Network.

"73. At one time, approximately fifty affiliated radio stations throughout Kansas, Oklahoma, Nebraska, and Colorado carried MAAN programming, consisting of agricultural and agribusiness reports that featured reporting and commentary by Larry Steckline. These reports attracted a significant audience. In exchange for the MAAN programming, that was provided to the stations at no cost, MAAN had the right to sell a specified number of advertising spots in or near the agricultural reports. All other adjacent spots were sold by the stations to sponsors who found value in having their spots air in close proximity to the agricultural reports. The stations frequently promoted the agricultural reports on their airwaves and that they were members of the Mid America Ag Network, as reasons for sponsors to advertise and listeners to tune in.

"74. In 1991 the National Association of Farm Broadcasters contracted with a marketing research firm who surveyed Kansans. Eighty-one of the 196 respondents named Larry Steckline as the agricultural broadcaster upon whom they depended regularly for relevant market reports and news. The second most mentioned broadcaster was named by only 17 respondents.

"75. Among the stations affiliated with MAAN were KFDI-FM and KFTI-AM, predecessor stations to those involved in the current litigation. Approximately three years after the Wisconsin-based Journal Broadcast Group purchased KFDI-FM and KFTI-AM, it attempted to terminate the contracts between the stations and Mid America Ag Network, Inc., that obliged the stations to carry MAAN programming. In 2002, with litigation pending in Sedgwick County District Court, Journal's CEO, Doug Kiehl and Larry Steckline entered into settlement negotiations.

. . . .

"77. Doug [Kiel] and Larry Steckline agreed to the terms of settlement in June 2003. The settlement agreement provided in part that KFTI had the right and obligation to broadcast Kansas State sports programming in the Wichita-metropolitan area subject to certain terms and conditions. Journal had the right to sell eight 30-second advertising

19

spots during the games and MAAN, Inc., retained the right to sell the remaining advertising.

. . . .

"79. In 2004, MAAN, Inc., sold the Mid America Sports Network and the rights to Kansas State programming to Learfield Communications, Inc., but retained the rights to the advertising inventory in the Wichita-area broadcast during games by affiliate, KFTI.

"80. The sale of MAAN, the Kansas State sports inventory and other the assets of MAAN, Inc., to an entity owned and controlled by Greg Steckline was consummated in May 2005.

"81. In an unrelated transaction, Greg Steckline purchased an AM radio station licensed in Wichita to broadcast sports programming. This station was assigned the call letters 'KGSO.'

"82. After his purchase of KGSO and MAAN, Greg Steckline contacted Eric McCart of Journal to inquire whether he intended to air Kansas State sports programming other than football games that were gratuitously offered by the university, e.g., men's baseball, spring football scrimmage, on KFDI/KFTI. McCart said he did not want to broadcast that programming."

Because of a numbering error, there were two paragraph 82s and no paragraph 83 in SCI's response.

"82. After the sale of the MAAN, Inc., assets, Greg Steckline asked Larry Steckline on several occasions to contact Doug [Kiel] to assist in resolving issues that had arisen between KFDI/KFTI and Greg Steckline's operating entity. In discussing the particular issue with Mr. [Kiel], Larry Steckline always made clear that he was calling on behalf of Greg, whose company now owned MAAN and the Kansas State sports inventory. Mr. [Kiel] would generally give Larry Steckline the name of a Journal employee that Greg should contact. Larry Steckline provided Greg with that information.

"84. Frequently, the name given by Mr. [Kiel] to Larry Steckline, which was then relayed to Greg Steckline, was Eric McCart. Mr. McCart was the sales manager and, later, the general manager of the KFDI/KFTI stations owned by Journal.

20

"85. After the sale of MAAN and the Kansas State sports inventory, Eric McCart telephoned Greg Steckline and asked whether Greg, as owner of sports radio station KGSO, was going to broadcast all the K-State games on that station. Greg declined, explaining that he could not do so because Journal had the exclusive contractual right under the 2003 settlement agreement to broadcast that programming over its air for 15 years.

. . . .

"87. In October 2010, Larry Steckline changed the name of the corporation he established and retained a controlling interest in after most of its assets were sold to SCI from Mid America Ag Network, Inc., to LS Media, Inc. He did this in an effort to diminish confusion that had arisen because MAAN was no longer owned by MAAN, Inc.

"88. From 2005, when he bought MAAN and the K-State inventory, until this litigation commenced in 2012, Greg Steckline frequently emailed employees of Journal at KFDI/KFTI. The emails sent by Greg Steckline have an automatic signature block with information that he is the president of Steckline Communications, Inc. Greg's email signature block also has a logo of the Mid America Ag Network, along with logos of four radio stations (KGSO, KQAM, KGYN and KIUL) owned by Steckline Communications, Inc.

"89. The technologies used by radio stations to receive programming from outside sources, to produce programming internally, and to broadcast programming have evolved. In general, the broadcast of radio programming is much more 'automated' than it was in the earlier years of the industry. Much of the programming broadcast is prerecorded, and fewer employees are required to see that it is broadcast. For example, Journal typically has only one employee on duty at the facilities from which its six radio stations broadcast simultaneously after six p.m. until the following morning.

. . . .

"91. SCI acknowledges that some of SCI's transmissions of programming and advertising to Journal for broadcast over KLIO-AM did not begin on schedule and/or was interrupted during the period preceding June 29, 2012, as a result of which KLIO-AM listeners encountered 'dead air' until the transmission of SCI's programming was commenced or restored, or employees of Journal took steps to broadcast alternative programming.

21

"92. Although SCI believes that some of the problems involving the delivery of the Mid America Ag Network programming were attributable to Journal, it acknowledges that it was responsible for most of them."

In its appellate brief, SCI incorrectly listed facts 24, 28, and 48 as having been adopted by the trial court as uncontroverted facts but the trial court did not accept those facts as uncontroverted. Moreover, the trial court did not address facts 24 or 28, and specifically found that fact 48 should be disregarded for lack of evidentiary support.

The trial court granted JBGK's motion for summary judgment and held that SCI had failed to establish the elements of an equitable estoppel claim. In making its decision, the trial court concluded that SCI's evidence offered to prove that JBGK "knew or should have known" about the assignment of MAAN's rights under the 2003 settlement agreement was "ambiguous" and, therefore, SCI failed to properly establish a claim of equitable estoppel:

"It is clear from the Supreme Court's prior opinion that equitable estoppel requires the party asserting the doctrine to establish the elements unambiguously, in this case that would include the knowledge of the sale of MAAN to a competitor, SCI in violation of the settlement agreement.

"In this case, SCI is alleging JBGK knew or should have known of the assignment of the settlement by MAAN to SCI. To demonstrate JBGK's knowledge or that they should have known they allege the following:

"1. Reports in local newspaper and periodicals about the sale of MAAN to Greg Steckline;

"2. Statements from Larry Steckline to Doug Kiel, President about the sale of MAAN to his son Greg Steckline and his intent to do so; and

"3. Emails from various persons at SCI to JBGK regarding the 'dead air' issues.

"However, the deposition of Larry Steckline calls into the question just how clear the actual sale of MAAN to SCI was to JBGK. He testified at his deposition that no details of the transaction regarding the sale of MAAN were divulged to the media. Mr. Steckline testified the press releases only indicated he was selling his interest in MAAN

22

because that was all the media needed to know. He also acknowledged the media release could have caused the media and business world to be under the impression that Greg Steckline bought MAAN. This does not support the plaintiff['s] theory that JBGK should have known from these releases that SCI, a competitor, actually purchased MAAN.

"The same is true regarding Larry Steckline's statements to Doug Kiel. Mr. Steckline testified in his deposition he only indicated to Mr. Kiel that his son Greg was buying MAAN. No specifics were given about the sale. Without details of the transaction divulged to Mr. Kiel, there could be various interpretations of how the sale was made. This does not support the plaintiff['s] theory that JBGK should have known from these statements to Mr. Kiel that SCI, a competitor, actually purchased MAAN.

"Finally, SCI alleges the emails sent from Greg Steckline, Brad Streeter, Jay Sanderson and Ron Metzinger should have put JBGK on notice of the sale of MAAN to SCI. The problem with the Plaintiff['s] argument is that even though Steckline Communications was noted in their signature sections, Greg Steckline and Brad Streeter still used the "MAANradio" email address when communicating with personnel at JBGK. Also, Jay Sanderson and Ron Metzinger continued to identify their employment with Mid America Ag Network when communicating with JBGK personnel. The email correspondence does not provide unambiguous evidence that JBGK knew or should have known of the sale to SCI.

"Even taking all the evidence and the deposition of Larry Steckline into the light most favorable to the Plaintiff it is difficult to establish JBGK's knowledge or constructive knowledge of the sale of MAAN to SCI, a competitor in violation of the 2003 settlement agreement between MAAN and JBGK. This is a necessary element to establish SCI's equitable estoppel argument. Therefore the defendant has met its burden and summary judgment is granted on this issue."

*Did the Trial Court Err in Granting Summary Judgment?*

SCI states that this court's standard of review is de novo because the trial court denied this issue on summary judgment. SCI also argues that summary judgment was improper because there was a disputed material fact which should have been submitted to a jury. Specifically, SCI argues that a jury should have decided whether JBGK knew or should have known that MAAN assigned its rights under the 2003 settlement agreement

23

to SCI. JBGK responds by asserting that because it is within the trial court's discretion to apply the principles of equitable estoppel, this court's review of the trial court's decision is limited to an abuse of discretion standard. JBGK also argues that SCI failed to prove the elements of equitable estoppel and summary judgment was, therefore, properly granted.

The parties both correctly detail the standards of review for summary judgment and equitable estoppel. JBGK correctly states that according to this court's decision in *Fleetwood Enterprises v. Coleman Co.*, 37 Kan. App. 2d 850, 161 P.3d 765 (2007), if there are no material facts in dispute, the trial court has discretion whether to invoke the equitable estoppel doctrine. When that is the case, an appellate court's review is limited to an abuse of discretion standard. 37 Kan. App. 2d at 864-65. Still, as SCI points out, on appeal, this court applies the same rules and when it finds that reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016). Moreover, equitable estoppel generally involves questions of fact and when the facts are disputed or when necessary facts come from ambiguous documents, summary judgment is inappropriate and the factual dispute must await resolution at trial. *Dunn v. Dunn*, 47 Kan. App. 2d 619, 639, 281 P.3d 540 (2012) (citing *Bowen v. Westerhaus*, 224 Kan. 42, 48, 578 P.2d 1102 [1978]; *Safeway Stores v. Wilson,* 190 Kan. 7, 12, 372 P.2d 551 [1962]).

*Summary Judgment*

"'Summary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial.'" *Stechschulte v. Jennings*, 297 Kan. 2, 14, 298 P.3d 1083 (2013) (quoting *Esquivel v. Watters,* 286 Kan. 292, 296, 183 P.3d 847 [2008]). Additionally, "'[a] court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a

determination of the state of mind of one or both of the parties.' [Citation omitted.]" *Foster v. Judilla*, No. 108,676, 2013 WL 5736059, at *5 (Kan. App. 2013) (unpublished decision) (quoting *Brennan v. Kunzle,* 37 Kan. App. 2d 365, 378, 154 P.3d 1094, *rev. denied* 284 Kan. 945 [2007]).

The standard governing cases that arise on appeal from summary judgment is often recited:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to judgment as a matter of law. *The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought.* When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. *On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.* [Citations omitted.]""" (Emphases added.) *Armstrong*, 305 Kan. at 24.

The trial court granted JBGK's motion for summary judgment against SCI, precluding its equitable estoppel claim. As explained by our Supreme Court, if SCI had established the elements of equitable estoppel, JBGK would be estopped from making the argument that the contract between MAAN and JBGK didn't allow assignment without consent.

In its motion for summary judgment, JBGK listed the following as an uncontroverted fact:

> "28. JBGK was not informed of any assignment of rights by Mid America Ag Network, Inc., to SCI (or its predecessor company), in 2005 or thereafter, and JBGK was

25

not aware of any assignment at any time while it was performing under the 2003 Settlement Agreement."

In its response to JBGK's motion for summary judgment, SCI stated: "It is uncontroverted that [MAAN, Inc.] did not ask [JBGK] for approval of its plan to assign the Settlement Agreement to SCI's predecessor-in-interest prior to doing so. Controverted to the extent this paragraph asserts that [JBGK] was not aware of the assignment at any time." The trial court did not address whether this fact was uncontroverted, controverted, or immaterial in its memorandum decision. Yet the trial court correctly explained that SCI needed to prove that JBGK knew or should have known MAAN, Inc., assigned its rights under the 2003 settlement agreement to make a claim of equitable estoppel.

*Equitable Estoppel*

"Equitable estoppel is the effect of the voluntary conduct of a party whereby the party is precluded, both at law and in equity, from asserting rights against another party relying on such conduct." *Petty v. City of El Dorado,* 270 Kan. 847, 853, 19 P.3d 167 (2001). Because "[t]here is no definite rule governing estoppel which can be applied to every situation," each case must be determined on its own individual facts. *Safeway Stores v. Wilson,* 190 Kan. at 12.

> "'A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. [Citations omitted.]'
>    . . . .
>    "The party asserting equitable estoppel will not prevail 'where facts are ambiguous or subject to more than one construction.' *Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 116, 991 P.2d 889 (1999). Needless to say, equitable estoppel

26

cannot exist if any essential element is missing or is not satisfactorily proved." 305 Kan. at 769-70.

The trial court denied SCI's claim for equitable estoppel based on a lack of proof that JBGK "knew or should have known of the violation of the contract." Specifically, the trial court held that SCI's claim failed because SCI relied on "ambiguous evidence" to prove that JBGK knew or should have known about the assignment.

In support of its factual basis for its estoppel claim, SCI provided the trial court with the following: (1) reports from a local newspaper and periodical about the sale of MAAN, (2) statements from Larry to Kiel about the sale of MAAN, (3) and e-mails from various persons at SCI to JBGK regarding "dead air" issues. SCI also provided the trial court with evidence that JBGK continued to work with SCI under the terms of the settlement agreement for seven years before it claimed that SCI was not a party to the settlement agreement because the agreement required MAAN to obtain JBGK's permission before assigning its rights under the settlement agreement.

The trial court first addressed the newspaper articles. The newspaper articles submitted to the trial court referred to the sale of KQAM 1480 to "Steckline Communications" and "Steckline Communications, Inc." Both articles also included quotes from Greg. The trial court noted that in Larry's deposition, he testified that he did not provide the media with the specifics of the sale of MAAN. Also, Larry testified that the media may have assumed that the sale was to his son, Greg. From this, the trial court found that this does not support SCI's theory that JBGK should have known from the media releases that SCI, JBGK's competitor, purchased MAAN. Here, although a close question, we conclude that a jury must be allowed to decide this material issue of fact. Moreover, the trial court did not weigh the evidence in favor of the nonmoving party, SCI.

27

The articles unequivocally show that SCI purchased KQAM, a competitor station to JBGK. The articles also stated that SCI also owned MAAN, "which provide[d] programming to 37 radio stations in Kansas, Oklahoma and Nebraska." While it is unknown whether JBGK read these articles, the articles unambiguously show that MAAN was owned by a new company. The articles, therefore, provided direct evidence of the sale of MAAN to another party. Moreover, the settlement agreement required JBGK's consent to *any* assignment of the contract, not simply an assignment to a competitor. It would be reasonable to believe that JBGK was put on notice that the settlement agreement had been assigned to SCI because SCI was now providing content to JBGK. This inference is particularly evident when considered with the fact that JBGK continued to work with SCI under the terms of the settlement agreement for at least seven years.

Next, the trial court considered the statements from Larry to Kiel, the then president of JBGK. While the statements did not provide direct notice that MAAN assigned its rights under the 2003 settlement agreement to SCI, they provided unambiguous proof that MAAN was sold to another entity. In his affidavit, Larry stated that "[w]hile not in writing, [Larry] delivered to [JBGK], via [Kiel], express notice that the assets of MAAN, Inc., would be purchased by an entity owned and controlled by Greg Steckline." This shows that Larry notified Kiel that MAAN, Inc. was selling its assets. Once put on notice of the sale, it would be reasonable that JBGK would investigate if MAAN had assigned its rights under the 2003 settlement agreement to another party in violation of the settlement agreement. The fact that Greg was Larry's son does not supersede the notice or knowledge that another entity would be purchasing MAAN, Inc. assets.

Then, the trial court addressed the e-mails between SCI employees and JBGK employees. The e-mails from various persons at SCI to JBGK regarding "dead air" issues also provided unambiguous proof that JBGK knew or should have known about the

28

assignment. The e-mails included interaction between several different SCI employees and JBGK. Most SCI employees still used "MAANradio" e-mail addresses but also included "Steckline Communications" in their signature boxes. In particular, Greg's signature box read: "Greg Steckline, President, Steckline Communications, Inc." Greg's signature box also included an SCI logo as well as a MAAN logo. While the continuous e-mail communication evidence by itself was a weak inference that JBGK knew or should have known of the sale and the assignment to SCI, that inference, however, must be drawn by a jury after trial, not by the trial court on summary judgment, where all evidence must be interpreted favorably to the nonmoving party.

Here, because the trial court improperly construed conflicting evidence against the nonmoving party, SCI, we reverse and remand for trial.

Reversed and remanded for trial.